Jack Carlton HOUSE

v.

Charles BALKCOM, Warden
Georgia State Prison.

Civ. No. C78–1471.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 13, 1983.

As Amended April 15, 1983.

John R. Myer, Atlanta, Ga., Jack Greenberg, James M. Nabrit, III, Joel Berger, John Charles Boger, New York City, Anthony G. Amsterdam, N.Y. University School of Law, New York City, Seth P. Waxman, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for plaintiff.

Mary B. Westmoreland, Asst. Atty. Gen., Atlanta, Ga., Timothy J. Sweeney, Special Asst. Atty. Gen., McCauley, Owen & Sweeney, Atlanta, Ga., for defendant.

TABLE OF CONTENTS

I. FACTS PERTINENT TO THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

 A. Background 1113
 B. Counsel's Pretrial Preparation 1116
 C. The Trial 1120
 D. Sentencing Phase of the Trial 1125

| | | |
|---|---|---|
| E. | Post Trial Matters | 1126 |
| | 1. The Michael Pitts/Jimmy Fields/Tommy Willoughby Testimony | 1126 |
| | 2. The Ramsey-Patterson Testimony | 1127 |
| F. | Habeas Proceedings | 1133 |

II. FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO THE INEFFECTIVE ASSISTANCE CLAIMS

| | | |
|---|---|---|
| A. | Pretrial Investigation and Preparation | 1134 |
| | 1. Interviews with Family Members | 1135 |
| | 2. Interviews with Police and Other State Witnesses | 1137 |
| | 3. The Search for Witnesses? | 1137 |
| | 4. Discovery | 1138 |
| | 5. Photographs of House's Bruises | 1138 |
| | 6. Miscellaneous | 1141 |
| B. | The Effect of the Atkinses' Deficient Pretrial Investigation on House's Conviction | 1141 |
| C. | Trial | 1144 |
| D. | The Effect of the Atkinses' Failings on House's Death Sentence | 1145 |
| E. | The Atkinses' Failure to File a Motion for a New Trial Based on the Ramsey/Patterson Testimony | 1146 |

III. OTHER CLAIMS ASSERTED BY HOUSE

| | | |
|---|---|---|
| A. | Voluntariness of the Confession | 1148 |
| B. | The Alleged Guilt Prone Jury | 1150 |
| C. | Exclusion of 18 to 21 Year Olds from the Jury Pool | 1150 |

IV. SUMMARY ........ 1151

ORINDA D. EVANS, District Judge.

## I. FACTS PERTINENT TO THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Because House claims that his trial counsel were ineffective in many respects before, during and after trial, a lengthy statement of the facts is essential.

### A. *Background*

At 1:00 a.m. on April 15, 1973, the dead bodies of Johnny Ray Smith and Robbie Dunn, seven-year old boys, were found in a wooded area off DeFoor Avenue in Atlanta. The discovery followed a search which began when one of the boys' fathers had ascertained they were gone at about 3:00 p.m. on April 14. (Tr. 110).[1] The police had been called at 6:00 p.m. (Tr. 110). Detective C.E. Landrum and Sergeant Richard L. Fitzgerald of the Atlanta Police Depart-

ment were present when the bodies were discovered.

On the morning of April 15, the police picked up Jack House, who lived a couple of blocks from the wooded area, for questioning. House was picked up at approximately 11:30 a.m. at his mother-in-law's home in Stockbridge, Georgia, by Sergeant Fitzgerald and Detective C.W. Smegal. They told House they wanted to question him about his whereabouts during the time when a crime had been committed in his neighborhood. According to Sergeant Fitzgerald, House responded he would be more than happy to cooperate, although he knew nothing. (Tr. 286).[2] After the group arrived at the station, House was advised of his rights and at 12:55 p.m. he signed a waiver of rights form indicating he did not want a lawyer. House participated in a lineup. (Tr. 216).

Thereafter House was taken to an interrogation room in the Homicide Office where he was questioned. The questioning began at around 2:30 or 3:00 p.m. and was conducted by Detective D.S. McCoy, who handles investigation of major sex crimes. (Tr. 152–156).[3] Sergeant Fitzgerald was present also. Additionally, House and others testified that during the period of the interrogation, Detective Landrum, Officer D.V. Lee, and possibly other officers, entered and exited the room a number of times.

Neither the trial transcript nor evidence taken at House's habeas hearings clearly shows at what point he indicated he wanted to confess. At some point photographs were taken. At about 4:00 p.m. blood samples were taken from House at Grady Hospital. (Tr. 359; February 7, 1983 habeas Tr. 50). At about 5:00 p.m. fingernail scrapings were taken by medical personnel at the police department. (Tr. 359). At about 4:30 House's clothes were turned over to crime lab personnel so they could be

---

**3.** Detective McCoy stated the time was just "an estimation." (Tr. 156).

**1.** References are to pages of the trial transcript unless otherwise noted.

**2.** House's version is that he agreed to cooperate because the officers indicated they would get a warrant if necessary. (Tr. 441).

examined for trace evidence (e.g., for hair or fibers matching those of the victims) (Tr. 358–360), and so that a blood spot which appeared between the left hip pocket and waistband of his trousers could be analyzed. (Tr. 445–446, 366, 371). In any event, at 5:55 p.m. House signed a written confession. According to Detectives Smegal and McCoy, who were present at that time, House dictated the confession to a female secretary who typed it up for his signature. (Tr. 135–136). Specifically, Detective Smegal testified:

Q Let me show you what has been marked as State's Exhibit Number 25. Can you now identify that?

A This is the statement that Jack Carlton House dictated to our secretary in the presence of Detective McCoy and myself.

Q Did the secretary, female assistant there actually typed that out?

A Yes, sir, she did.

Q Who gave her the information to put into that statement?

A Jack Carlton House.

(Tr. 135–136). The text of House's confession, in its entirety, is as follows:

Fulton County
Atlanta, Georgia
April 15, 1973
1750 Hrs, Sunday
5:50 PM

STATEMENT OF: Jack Carlton House, WM, 25, 1764 DeFoors Ferry Road, NW, Phone: None

I went to the Liquor Store around Noon on Saturday, April 14, 1973; the Liquor Store on Collier Road, and bought a half-pint of Karloff Vodka, costing $1.60. After buying this I had about fifty cents left in my pocket. I went back down Clairmont St. towards DeFoor Avenue; then I cut across some Apartment Yard located on Collier Road. Then I was walking down Clairmont and these two little boys come up and asked me if I was drunk. They were on their bicycles. I had fallen down and then I got up and just kept walking. Then I went up to the Little Store at DeFoor and Mantissa to pay James ... Camel who is the owner of the Store for a pack of cigarettes that I thought I had got from him the day before without paying, but as I got to the Store I remembered that I owed Mr. Bass up at the other store on DeFoor Avenue. Then I went across the street; which is DeFoor and into the woods. The little boys were behind me and they were carrying on but I was not paying much attention to them. After I got across the street I went into the woods where the little boys followed me. I had with me a coke bottle which I had poured what was left from the half-pint that I had bought. I then sat down and finished what I had in the Coke Bottle. At this time the boys had followed me down into the woods and they were still picking at me. I told them to go on and leave me alone but they wouldn't. So I reached up and grabbed one of them by the neck and got up and grabbed the other (I'm not sure how I grabbed him). They were hollering and screaming. I told them to quit hollering and made them take their clothes off. I then made them bend over; holding both of them. Then I screwed one of them in the ass-hole and then screwed the other. I can't remember if I had a sexual climax in one or both of them, and they kept ... hollering. Then I choked them to death. Then I took the bodies up to the Railroad Tracks by carrying one on each shoulder like a sack of flour. After getting up close to the Railroad Tracks I threw the bodies down, and I then ran out of the woods by the Dump and out Davis Circle. I then ran home. After I got home I went to bed. I got up a few minutes later and sat around awhile, and then my Mother-in-law, Vada Myers, came along and we drank some there at the house and then we went down to my Mother-in-law's house at Stockbridge, Georgia. And then this morning I got up and the Detectives came to the house and got me and brought me back to Atlanta.

I was wearing green pants and a blue shirt with white stripes and a black felt hat with a Gold Band around it.

This statement is given freely and voluntarily, and I have been advised by the Detectives that anything I say may be used against me; that I have a right to remain silent; that I may have an Attorney present during questioning, and that if I can not afford an Attorney that one would be appointed for me. After being advised of these Constitutional Rights the Detectives asked me if I fully understood them, and I told them that I did, and I then freely and voluntarily signed a Waiver of Counsel and gave this statement. I have read this statement and it is true to the best of my knowledge.

/s/ Jack Carlton House

Jack Carlton House, WM, 25

WITNESSED: /s/ C. W. Smegal
/s/ D S McCoy

---

Sergeant Fitzgerald did not witness House sign the confession. He had gone off duty at 4:30 or 5:00 p.m. (Tr. 211, 216; cf. Tr. 135, 155, 255).

After House had signed the confession, Detectives McCoy and Smegal and Sergeant D.V. Lee took House in an automobile to his neighborhood. They went to his home for the purpose of executing a search warrant and also picked up some extra clothes and shoes. (Tr. 337). According to Detective Smegal, they asked House to show them the scene of the crime. He stated House then directed them along DeFoor Avenue to the point where his statement indicated he had entered the woods and at that point asked the officers to stop the car. (Tr. 338). Detective Smegal then testified in response to the prosecutor's questions as follows:[4]

\* \* \* \* \* \*

A .... He then—we got out of the car and he directed us through the woods from here through to a little path that leads off into the woods and directed us to this point here (indicating) and then came over and directed us here (indicat-

ing) and said, "This is where I put their clothes."

Q All right. Who was leading and who was following and exactly how was this done?

A All right. We were with him and letting him walk down the trail ahead of us.

Q All right. When he indicated where the clothes were found did he point out a general area or exactly what did he do if you recall?

A No, he walked over to the area and he said, "This is where I put the clothes."

Q What, if anything, was there where he pointed?

A I didn't work the scene but that is where the clothes were, some of the underwear was—

MR. ATKINS: Your Honor, if he didn't work the scene I object to all of this testimony except what the man told him. The—he contends that he took him over there and told him something but now he is up there testifying that this was where they found so and so even though he didn't work the scene and I object to all of that as being hearsay.

MR. HAYES: I won't insist on that, Your Honor.

Q (By Mr. Hayes) I am referring to the time you went there with him, was there anything physically in the area where he pointed?

A There was a pine tree, a tree limb that was lying over the area near where he said this is where he had put the clothes.

Q Did he walk right up to that spot?

A Yes, sir, he walked right up to the spot and said, "This is where I put the clothes."

Q All right. Where did you go from there?

A We then asked him what he was talking about. He said in his statement that he had carried the bodies from there and we asked him to show us where he

---

4. State's Exhibit 22—a chart of the wooded area—is helpful in following this testimony. A reduced copy of the chart is included in an

Appendix filed contemporaneously with this Order.

carried them to and he then directed us down this trail to a point here (indicating) and said, "Go over to the right there," and we went over to the right and he stopped here and said, "This is where I put the bodies."

Q All right, sir. This line going here, what is that?

A It's a trail through the woods.

Q All right. Does that trail end here at this No. 14 or does it—

A No, sir, the trail continues, this was just woods, you couldn't distinguish it, make a distinction between it and any of the other woods along in here. He just stopped at this point and he said, "It's off to the right, right over there," and he walked over to this point and said, "this is where I put them."

Q Did anybody indicate to him where to turn or anything?

A No, he indicated all of this. He walked directly to the place where the clothes were found and to the place where the bodies were found.

Q All right, sir. Was there any hesitating as he walked through the woods there?

A No, sir, he walked directly to each of the two places.

(Tr. 338–341).

### B. *Counsel's Pretrial Preparation*

On Thursday, April 19, 1973, House was visited at the city jail by Mrs. Dorothy D. Atkins, an attorney who had been hired by House's mother to represent him.[5] (Tr. 195,

228). House told her he had not killed the boys. (November 16, 1982 habeas Tr. 51). He told her he had been beaten by the police until he signed some papers. (Tr. 195–196). Dorothy Atkins testified at trial that House showed her a "red place" on his ear and on his face during that first meeting which he contended the police had inflicted.[6] (Tr. 527). Apparently House told Mrs. Atkins very little about the events of April 14, the date on which the crimes were committed.[7] In response to a question on that subject during one of the habeas hearings, Mrs. Atkins said:

A I talked to him about where he was and what he was doing, and he stated that he was drinking on Saturday, that he did not know anything else, and that on Sunday he went out of town with his wife.

Q Did he tell you at that time that on the Saturday in question when the crimes were committed that he was in the wooded area?

A No he didn't. He didn't tell me.

Q What exactly did he tell you about his activities on that Saturday?

A He said that he was in the area, the entire area of where he was living, and then he was a little bit vague as to what—he stated that he had been drinking. He stated this very definitely, and that he was in the area around the neighborhood on Saturday.

Q Well, did you all go over the details of what happened on that day from the time he got up onward?

---

5. Actually, both Mrs. Atkins and her husband, Ben Atkins, eventually represented House. However, it appears that Mrs. Atkins was initially retained. They were paid between $1,000 and $2500 to represent House (*cf.* November 16, 1982 habeas Tr. 15, 49; Tr. 15; February 7, 1983 habeas Tr. 84).

6. Mrs. Atkins' testimony at the habeas hearings regarding marks on House's body has been more wide-ranging though less specific. *See* May 28, 1980 habeas Tr. 99 ("... he showed me the bruises and contusions on his head, body, shoulders, legs ..."); November 16, 1982 habeas Tr. 54 ("... on the side of his face and head and his hands and his legs, his shoulders and body ...").

7. This failure was not due to any lack of ability on House's part to communicate. This Court has heard House testify on two occasions and finds him to be of apparent average intelligence. Though he speaks ungrammatically, he has no difficulty in understanding questions and responds without hesitation. His capacity to recall the events surrounding his trial appears better than that of the Atkinses.

House's eighth grade school records indicate he scored 77 on a Stanford-Binet IQ test, which is understood to reflect a subnormal intelligence. This is inconsistent with this Court's impression of House's intelligence which places him in the middle range of average or normal intelligence, *i.e.,* an IQ of about 100.

A No Ma'am.

Q Well what else did you talk about that related to his case?

A That was about the main thing we talked about, about his drinking on Saturday, and he was a little vague about in the area he said around the house, and around the neighborhood, and that he went out of town, and that he was brought back into the jail on Decatur Street, and that he was beaten, and that was the main thing. He showed me his bruises.

(November 16, 1982 habeas Tr. 52–53).

Jack House did not tell his counsel about the spot on his pants or that the police had taken his clothes for lab analysis (February 7, 1983 habeas Tr. 129), although he knew the police suspected the spot was a blood spot. (Tr. 446).

Following their initial meeting, Mrs. Atkins waived the committal hearing and House was transferred to the Fulton County Jail on the same day, April 19. (Tr. 527).

On April 20 or possibly April 21, Benjamin S. Atkins, law partner and husband of Dorothy Atkins, visited House at Fulton County Jail. (Tr. 529; November 16, 1982 habeas Tr. 24). Ben Atkins testified that the facial bruises his wife had seen on the preceding day were gone (Tr. 531; May 28, 1980 habeas Tr. 86–87); however, it had been his experience that bruises disappear rather quickly. (Tr. 531). However, Atkins testified at the trial that he viewed a round spot on House's chest "where he had been punched with something." (Tr. 199–200). Ben Atkins further testified that at his request, House "pulled down his breeches, I had him pull down his breeches and show me right in here (indicating) bruised places on his legs and up to his groin. There were several, I didn't count them, but there were

several blue bruised spots there." (Tr. 199–200).

Ben Atkins did not take photographs of House's alleged bruises. He later explained to the jury at trial that he had thought about it but " . . . I decided against taking a picture of it for the simple reason that I didn't want to bring his private organs which would have been involved, a picture of all that into court, and I assumed that a jury would take my word that he was bruised and from somewhere in this neighborhood (indicating) up." (Tr. 530).[8]

Dorothy Atkins, Ben Atkins and Jack House have all testified they have no clear recollection of their further meetings prior to trial. House testified there were, at the most, three or four meetings including the initial meeting. (November 16, 1982 habeas Tr. 29). He testified he did remember talking to Ben Atkins a couple of days before the trial. (November 16, 1982 habeas Tr. 33). Dorothy Atkins testified she believed she did not see House again between their initial meeting and the trial. (November 6, 1982 habeas Tr. 56). Ben Atkins said he thought he saw House a total of one or two times prior to trial. (January 14, 1983 habeas Tr. 13).

Although the matter of what information House gave the Atkinses is of critical importance to House's claim that their pretrial investigation was deficient, it is virtually impossible to determine on the record before the Court what further information, if any, House gave the Atkinses concerning the events of April 14, 1973 beyond the vague information he gave Dorothy Atkins on April 19. This is primarily a function of the substantial time lapse between the trial and the habeas hearings.[9]

Ben and Dorothy Atkins discussed House's case. They have testified they be-

---

**8.** In response to the prosecutor's question, Ben Atkins testified as follows: .

Q It never occurred to you to cover that area with a cloth?

A Sir, you couldn't cover it with a cloth. That was the main part of the area that was damaged, around here (indicating).

(Tr. 532).

**9.** It is also, in the Court's opinion, a product of the Atkinses' desire to avoid harming whatever chances exist for habeas relief. Ben Atkins is clearly a partisan witness. While the Court makes no finding that he has intentionally misstated any facts in these proceedings, his bias appears to have caused him to resolve doubts—of which there are many due to passage of time—in House's favor.

lieved he did not kill the boys. This belief was stated to be based on their acceptance of House's story [10] and their feeling that it would be physically impossible for one drunk man to physically control, sodomize and kill two seven-year old boys. Also, they said they felt the crimes could only have been committed by a homosexual.

Mrs. Atkins discussed House's case with his family, including his wife, but according to Mrs. Atkins:

A Well I talked to his family mainly because he had no further information that we could gather, and I talked with his family to see what information I could get, and ask them and they cooperated to the best of their ability, but there was seemingly a lack of full communication in getting proof of his activities and what happened. Maybe because of the drinking problem. I do not know, but we could not get or ended up not getting any witnesses other than the family on his behalf.

Q Did you talk to Mrs. Judy House about what Mr. House's activities had been on the Saturday when the crimes were committed?

A I did, but she stated she was not with him.

Q Was she able to provide you with any information?

A About Saturday, no, not that I remember.[11] I remember she said she asked him to go with her on Sunday. (November 16, 1982 Habeas Tr. 56–57).

The Atkinses did not consult a medical expert prior to the trial in order to deter-

mine whether or not an inebriated man could physically control, sodomize and kill two seven-year old boys. They did not visit the crime scene prior to the trial, or canvass House's neighborhood for witnesses who might help in establishing his whereabouts on the afternoon of April 14.

A two-count murder indictment was returned against House by a Fulton County Grand Jury on April 27, 1973. The witnesses listed on the indictment included the fathers of the two victims, the county medical examiner who had performed the autopsies, a State Crime Lab technician, a Grady Hospital physician, a neighbor of House's and Detectives Landrum, McCoy and Smegal of the Atlanta Police Department, as well as Sergeants Fitzgerald and Lee. Although the Atkinses had a copy of the indictment, they did not interview any of the witnesses listed on it prior to the trial. Had the Atkinses chosen to interview the crime lab witnesses, they would have learned that both the blood spot on House's trousers and the blood of Robbie Dunn were type A, positive for M antigen of the M–N series, but that House's blood was type O.[12]

Although Ben Atkins has testified that he did not act as counsel for House until the day of trial, the Superior Court records show that he entered an appearance of record as House's counsel on May 4, 1973.

In 1973 in Georgia only so-called "Brady" material, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), was dis-

---

Dorothy Atkins did not seem as biased, but appeared confused and upset. Her capacity to recall what happened in 1973 is extremely limited. Since she handled the pretrial investigation, her inability to remember the details significantly handicaps the Court in making findings in this area.

**10.** Dorothy Atkins had, and still has, a subjective belief in her client's innocence. For example, she said it never entered her mind that House's bruises could have been inflicted by the victims of the crime. (November 16, 1982 habeas Tr. 62). The Court has no particular impression as to whether Ben Atkins shares this feeling. Of course, whether or not the

Atkinses believed House was innocent has no bearing on the quality of representation they were obligated to provide.

**11.** Judy House testified at trial that her husband was at home at 4:00 p.m. on April 14. Dorothy Atkins said Judy House had not told her that before trial. (February 7, 1983 habeas Tr. 129).

**12.** The Court finds as a fact that the crime lab personnel would have freely provided this information on request. (*See* February 7, 1983 habeas Tr. 13).

coverable by right.[13] Formal discovery motions were unknown. (May 30, 1980 habeas Tr. 428). The prosecutor had no absolute obligation to give the Atkinses a copy of House's confession or tell them about the lab test results.

However, the prosecutor, Thomas W. Hayes, testified that due to the particular gravity of this case, he decided to give a copy of the confession, plus the blood test results, to Ben Atkins. (February 7, 1983 habeas Tr. 8–9). He recalls meeting with Ben Atkins and giving him a copy of the confession, plus at least telling Atkins about the match between the blood spot and one of the victims' blood types. (February 7, 1983 habeas Tr. 9–10). Ben Atkins has testified somewhat equivocally that he does not recall this with certainty, although he does not deny it either. (May 29, 1980 habeas Tr. 10–11; 34–35; 71–73). Hayes' testimony is credited. The Court infers that this meeting took place on or after June 28, 1973, however.[14]

Ben Atkins was never asked at the habeas hearings whether he confronted Jack House with information that the blood spot matched the blood of one of the victims to see if House could provide a possible explanation for the source of the blood spot. Presumably, if he were asked he would state he cannot remember. At the same time, Jack House testified at a habeas hearing that he did not recall the blood spot being mentioned until trial. (November 16, 1982 habeas Tr. 35). Dorothy Atkins convincingly stated she did not know about the blood spot prior to trial (November 16, 1982 habeas Tr. 65), which must mean she did not inform Jack House about it.

This state of the evidence makes a finding on the critical issue of whether the Atkinses told Jack House about the blood spot prior to trial difficult. Clearly, they had a duty to tell him. But did they?

Ben Atkins met with Jack House shortly before the trial, apparently after he had received information from the prosecutor about the blood spot match. This would have been a logical time for Atkins to report the blood spot information to House. House's testimony that he didn't recall hearing about the spot until trial was not particularly convincing. On the other hand, there is no evidence which tends to prove that Atkins in fact did tell House about the blood spot.

Given this state of affairs, the Court elects to make no finding of fact on this issue. However, it will assume, without deciding, for the balance of this Order that the Atkinses did not tell Jack House about the results of the blood spot tests prior to trial.

House has not claimed that he suggested an explanation to the Atkinses before trial as to the origin of the blood spot. His position appears to be that he had no reason to suggest a possible explanation because he did not think the spot on his pants was blood.

On June 28, 1973, Ben Atkins filed on House's behalf a Motion to Suppress Confession, contending his confession was the product of police brutality and coercion. This motion was heard out of the presence of the jury near the beginning of House's trial in the Superior Court of Fulton County on July 9, 1973. The Court heard testimony from Sergeant Fitzgerald and Detective McCoy. They described the interroga-

---

**13.** A copy of the indictment plus a list of the witnesses was available on demand in 1973. Ga.Code Ann. § 27–1403, *codified* Official Code of Ga.Ann. § 17–7–110 (1982). However, Ga. Code Ann. §§ 27–1302 and 1303, *codified in* Official Code of Ga.Ann. §§ 17–7–210 and 17–7–211 (1982), making defendant's statements and scientific reports in the possession of the prosecution discoverable were not enacted until 1980.

Insofar as the Court is able to determine, there was no *Brady* material in this case. The lab reports were inconclusive. They did not affirm or negate House's identity as the killer. *See* Petitioner's Exhibits A and B, May 30, 1980 habeas hearing.

**14.** The Court infers from the affidavit attached to the Motion to Suppress filed on June 28, 1973 that as of that date Atkins had not viewed or received a copy of House's confession, because the motion merely recites that Atkins had been "informed" that House had made certain incriminating statements.

tion and flatly denied having abused or coerced House in any way. House took the stand and testified that Sergeant Fitzgerald and Detective Landrum [15] had beaten, kicked, and slapped him repeatedly during the interrogation. (Tr. 173–181). Dorothy Atkins testified that House indeed had reported to her that he had been beaten by the officers (Tr. 195), though she did not state she had seen any bruises. Ben Atkins testified that he had seen several bruises in House's groin area, and a "round spot" on House's chest. (Tr. 200).

Detective Smegal also testified at the *Jackson v. Denno* hearing. He described the manner in which he had advised House of his constitutional rights, including his right to have an attorney and to remain silent. He said House verbally indicated he understood his rights and that he did not have any questions about them. Detective Smegal further testified that House then stated he wanted to talk to the officers without having an attorney present and that House then signed a Waiver of Rights form (State's Exhibit No. 24; copy included in Appendix). Detective Smegal described House's demeanor and appearance at the time the waiver was signed. He stated that he was not present during House's interrogation, but that he subsequently heard House dictate his oral confession to a secretary. Smegal further confirmed that he had witnessed House sign the confession.

House admitted dictating part of the confession, but contended the incriminating part regarding what happened after he entered the woods was not dictated by him. (Tr. 186–188). He stated he signed the confession out of fear.

Judy House took the witness stand and testified initially that her husband had been drinking "a little" when the police had picked him up on April 15. However, in response to a further question from defense counsel, she stated he had had a good bit to drink before he was picked up. (Tr. 193). During Jack House's *Jackson v. Denno* testimony, he had given the following testimony relative to his mental state:

Q Then the officers are telling the truth when they say you weren't drinking anything that they know of?

A No, I was half drunk, but my mind was clear.

Q Well—

A I mean, in my own physical fitness, I was half drunk but I knew what I was mostly doing.

(Tr. 169).

House claimed he had asked to see a lawyer before he signed the confession. (Tr. 169).

After hearing the foregoing evidence, Judge Sam Phillips McKenzie ruled that the confession was freely and voluntarily given. (Tr. 254).[16]

At the time the trial opened, the Atkinses determined that Ben Atkins would assume the lead role.[17]

### C. *The Trial*

The evidence presented to the jury at the trial beginning on July 9, 1973, unfolded as follows:

Thomas H. Reid, Jr., who lived in an apartment complex near the corner of Collier and DeFoor Avenue, testified that he saw a suspicious looking individual wearing a dark hat lolling about in the area at

---

**15.** House has always said that Sergeant Fitzgerald did most of the beating. He says Detective Landrum was not present except intermittently during the interrogation. Detective Landrum did not testify at the trial but testified at a habeas hearing that he was present intermittently. However, he denied seeing anyone strike House or observing any signs that he had been struck. (June 15, 1979 habeas Tr. 192).

**16.** In so ruling the Court indicated one basis was House's lack of credibility.

**17.** Ben Atkins testified at habeas hearings that he had had nothing to do with the case prior to trial. This is incorrect. On May 4, 1973 he entered an appearance. On June 28, 1973 he filed the Motion to Suppress House's confession. Further, the prosecutor testified he had met with Ben Atkins prior to trial and received the impression that Atkins was going to try the case. (February 7, 1983 habeas Tr. 7).

mid-afternoon on April 14. He placed a call to the police, although there apparently was no response. He saw the individual, who was staggering, turn the corner and start down DeFoor Avenue. (Tr. 95–102).

John Allen Dunn, father of one of the victims, testified he was in his front yard on Claremont Street that afternoon and at around 2:30 saw an individual staggering down the street going toward Mantissa Street. He stated his son Robbie and Robbie's friend, Johnny Ray Smith, started to run out in the street "to play with him or something, and I pulled my belt off and made them get back in the yard." (Tr. 104). A few minutes later, after the man had gone down the street, the two boys got on their bicycles and rode in the direction in which the man had gone. According to Mr. Dunn, the individual was wearing a black western style hat with some type of band on it. (Tr. 106–107).

Next, Theron C. England testified. He stated he lived near the corner of Mantissa Street and DeFoor Avenue. He stated that at approximately 3:00 p.m. on April 14, he saw a man wearing a black hat with a fairly wide brim cross DeFoor Avenue and enter the wooded area directly across from his house. Specifically, he said

.... I saw this guy go across the street and then the little Dunn boy along with another little boy, which at the time I did not know his name, came across the street about twenty feet behind the guy with bicycles.

(Tr. 111–113).

Mr. England further testified that he heard one of the boys say, "Let's leave our bicycles here, we can't keep up if we ride them down through the woods...." (Tr. 114). He stated then he saw the children enter the woods in the same direction as the individual in question.

T.J. Whitfield, who lived at 1140 Davis Circle, N.W., testified that at approximately 4:00 p.m. on April 14, he observed a man walking unsteadily down Davis Street. He testified this individual had come from the west on Davis Street and was walking east (see State's Exhibit 22, included in Appendix). He stated the individual then went up Davis Place toward Davis Circle. He was wearing a black hat. (Tr. 122–125).

The Jack House residence was located at the corner of Davis Circle and DeFoor Avenue.

James T. Smith, father of Johnny Ray Smith, described his search for his son on April 14 after he learned he was missing. Officer R.M. Dale of the Atlanta Police Department testified about being in the wooded area with him when the childrens' clothing and bodies were discovered. (Tr. 255–258).

Sergeant Richard L. Fitzgerald then testified about being called to the scene at 1:00 a.m. along with Detective C.E. Landrum (Tr. 260–263) and about his subsequent investigation. He described for the jury how House was advised of his rights at the police station and that House was then turned over to Detective McCoy for interrogation. He stated he was present and that numerous police officers were in and out of the room during the interrogation. (Tr. 292–293). He denied mistreating House in any way. He stated he had turned House's clothes over to Kelly Fite of the State Crime Lab.

Fitzgerald took the position in response to questions from the prosecutor that House's interrogation had taken place in what he described as the homicide "squad room," which apparently was a room near the public access areas on the detective floor. In response to a question from the prosecutor, he testified as follows:

Q Is the squad room the normal place for interrogations?

A It's the only place we have to interrogate an individual.

(Tr. 300).

Detective Smegal was called next and stated he advised House of his rights at the time he arrived at the police station. He said he had watched House sign the waiver of rights. (Tr. 304). He said House appeared coherent and able to understand his rights. (Tr. 306).

Detective McCoy then took the stand and told the jury about conducting the interrogation of Jack House. He denied having made any promises to House, or having subjected him to any abuse. (Tr. 310). He said House ultimately told him that he had killed the two boys. (Tr. 311). He said after House had made these admissions, he had the oral statement reduced to writing (Tr. 312); he said House read the confession and signed it in his presence. (Tr. 312).

Officer Marion M. McDonald, Jr. then testified about the preparation of State's Exhibit No. 22, the chart of the scene of the crime and surrounding neighborhood. He also testified as to the manner in which he prepared State's Exhibits Nos. 1–21, which are color photographs of the area portrayed on the chart showing the various position numbers marked on the chart. (Tr. 329–334).

Detective Smegal was then recalled to the stand. He told the jury about taking House out to his neighborhood after the confession was signed and how House had led him, Detective McCoy and Sergeant Lee to the place where he had left the victims' clothes and bodies. (Tr. 338–340). He also stated for the jury's benefit the testimony he had previously given during the *Jackson v. Denno* hearing to the effect that House had verbally related his confession to a typist who typed it out as he gave it. (Tr. 342). Smegal's statement that the typist was female, not male, was challenged by defense counsel on cross examination and Smegal replied he did not think he was mistaken in that regard. He pointed out that they only had one male typist, who did not work in homicide. (Tr. 346–347).

The State introduced expert testimony showing that the blood spot found on House's trousers positively was not his blood. However, the particular type of blood contained in the spot—Type A positive for M antigen in the M–N system—was the same type as that of one of the victims. Elizabeth Thomason, who works for the Georgia State Crime Laboratory, explained to the jury that this particular blood type combination is found in 12% of the population.

Kelly Fite of the State Crime Lab testified that all examinations conducted, except for the blood tests, on the items turned over—the clothing and presumably the fingernail scrapings—had yielded negative results. (Tr. 362).[18] He said he was present at Grady at 4:00 p.m. when blood was taken from House. He said he examined House's hands and took fingernail scrapings at 5:00 p.m. in the interrogation room at the police department. (Tr. 358–359). He said House did not appear to be in any discomfort or pain. (Tr. 359).

Next Robert Stivers, Medical Examiner for Fulton County was called for testimony regarding his autopsies of the victims' bodies. He testified that the bodies were bruised and scratched. He described injuries consistent with asphyxiation by choking. (Tr. 374–379). In response to a hypothetical question from the prosecutor, he stated that he thought an adult male would possess sufficient physical strength to handle two children of the size of the victims. He pointed out that the victims weighed about 45 pounds each and that children of seven years of age are of low muscle strength. (Tr. 384). He stated that the injuries he found on the Dunn boy were consistent with forcible sodomy. (Tr. 384).

On cross-examination, Ben Atkins questioned Dr. Stivers concerning the effect of alcohol on male sexual competency. Dr. Stivers' response was basically that the level of competency depends upon the level of drunkenness. He stated that the degree of drunkenness associated with a staggering gait is not necessarily that degree which would foreclose the ability to maintain an erection and commit sodomy (Tr. 386–391), but that there is a point where an entire range of volitional activity—including running, grasping, and volitional sexual activity—is foreclosed. (Tr. 390, 395). Dr. Stivers further volunteered testimony that "... at this age children are like small animals, they tend to fall to the ground and hide rather than run." (Tr. 395).

**18.** The results were inconclusive. *See* note 13, *supra.*

The prosecutor read House's confession to the jury and the State rested.

Ben Atkins called as his first witness House's sister Nancy Jones. She testified House had lived in his neighborhood all his life, was married, and had three children. (Tr. 408–410). She admitted on cross that House drank a lot. (Tr. 414).

Next, House's wife Judy House was called. She testified that she had been shopping on Saturday the 14th of April but returned at 4:00 p.m. and found her husband asleep at home. (Tr. 421).

She also testified that on either Saturday or Sunday morning, she and her husband had had sexual intercourse. She testified she was menstruating slightly and that while they were having intercourse, her husband had kept his pants on.[19] She testified she had never known him to be sexually abnormal (Tr. 417), and that they had been married for eight years and had three children. (Tr. 417). She testified that the police officers had picked Jack up at her mother's house in Stockbridge on April 15 at 1:00 p.m.[20] On cross examination, Mrs. House defended her statement that House had been at home at 4:00 p.m., testifying that she looked at the clock when she got home and it was exactly 4:00 p.m. (Tr. 423).

Jack House then took the stand in his own behalf. He was permitted to give a rambling narrative of the events of April 14, 1973.

House's narrative statement was long, detailed, and appears to evidence a good bit of prior reflection on his part. The statement is too lengthy to be set out verbatim herein, but a copy has been included in an Appendix filed contemporaneously herewith for ease of reference. The statement is important because it is the only place in the record where a full version of the facts as told by House appears.

House's statement is summarized as follows: On the morning of April 14, House and his wife did some shopping and various activities. After they returned home he started drinking. He went to his mother's home for a while and then[21] to a liquor store on Collier Road. He gulped down half of the vodka he purchased and poured the rest into a soft drink bottle. He walked back down Seaboard Avenue, and then turned on Claremont when he saw two little boys who asked if he was drunk. He walked on going toward a store at the corner of Mantissa and DeFoor Avenue. He looked back and noticed the two small boys coming behind him on their bicycles.

House then stated he entered the wooded area on DeFoor Avenue. He lay down and as he shut his eyes he could hear someone talking. He passed out, and when he woke he had no idea what time it was. He left the wooded area the same way he entered, and went down DeFoor Avenue to Davis Street, then on Davis Street to Davis Place, where he turned and went to his home at the corner of Davis Circle and DeFoor Avenue.

---

**19.** This testimony came about as the result of the following sequence of events: When Jack House heard the crime lab witnesses testify at trial that the spot on his pants was blood, he suggested to Dorothy Atkins at counsel table that the spot could have been his wife's menstrual blood or the blood of House's niece who allegedly had cut herself on a swing on Sunday, April 15. (November 16, 1982 habeas Tr. 74). Dorothy Atkins then spoke to Judy House at a recess and Judy House concurred in her husband's suggestion that they had had sex on April 15 when her menstrual period was beginning. (November 16, 1982 habeas Tr. 74). Judy House then took the witness stand and gave the testimony reflected above.

At a habeas hearing, Judy House denied knowing about the blood spot before trial, or consulting with Dorothy Atkins before giving the referenced testimony. (November 16, 1982 habeas Tr. 85–89). Dorothy Atkins' testimony regarding the prior consultation is credited rather than that of Judy House.

**20.** This was clearly incorrect. The waiver of rights form was executed at the Atlanta police department at 12:55 p.m. The officers testified they had picked House up in Stockbridge at around noon.

**21.** House's brother testified at trial that Jack House left their mother's home at the corner of Claremont and DeFoor Avenue after 2:30 p.m. (Tr. 516–517).

House stated that later that evening, he went to his in-laws' home in Stockbridge, Georgia. The next morning the police came and asked to talk to him. He agreed. After they got to the police station House signed a waiver of rights form.

House then described in a great deal of detail how he was interrogated and allegedly beaten.

House said the police then took his pants, stating they wanted to look into an apparent blood spot on them. He said that at the time he felt it was not a blood spot, as he had been unaware that his wife had been having a period.

House testified he finally decided to confess to stop the beating he was receiving. He stated he had dictated a part of the confession to a male typist, but contended that prior to the incriminating part about the killing he stopped dictating. He did not explain how the rest of the confession was physically prepared.[22] He stated he then signed it without reading it. He said:

... I just had no desire to read it, I just sat there and stared at it. I could see my future, I could see my wife, my three kids and all that down the drain. I mean, you can get all the ass you want by the drop of a billfold.

(Tr. 459).

House then described how he took the officers to the crime scene. He did not contradict Detective Smegal's trial testimony that he took the officers to sites where he indicated the victims' clothes and bodies had been left.

He testified that he was able to locate the place where he had laid down because of a piece of plastic in the area, plus a cigarette butt he noticed on the ground. However, he made no specific mention of how he was able to locate the spot where the victims' clothes had been.

House explained he deduced where the victims' bodies had been found by figuring they must have been near the site where

the police contended he was seen exiting the woods. He said he took the police up toward that area, and that he kept examining the ground along the pathway until he saw a spot where the ivy appeared to have been trampled down.

Finally House explained how he went to a committal hearing when the judge inquired about the fact that he did not have a lawyer. With that, his narrative statement ended.

On cross examination, House admitted that State's Exhibit No. 23 was his hat and that he had been wearing it on April 14 and 15. Although State's Exhibit No. 23 has not been viewed by this Court, it is inferred that it is a black, western style hat.

The following colloquy occurred during cross examination:

Q Did you say yesterday that you can get all the ass you want by the drop of a billfold?

A You sure can.

Q Is that what you said yesterday?

A That is what I said yesterday.

Q And that is the word you used, right, ass?

A That is the word I used.

Q Mr. House, you can—you stated or have you stated whether or not you can read, sir?

A I can read.

Q Would you look at—

A But can I say something? I was not preferring (sic) to it as you are preferring (sic) to it.

Q What am I referring to, sir?

A You are trying to go over that statement where it says ass in the statement—

Q Yes, sir.

A —and that is not the ass I was preferring (sic) to.

Q That is very clever, Mr. House.

A I knew what you were driving at.

Q Is it in that statement?

---

22. At a habeas hearing House testified Sergeant Fitzgerald read these parts from a notebook to the typist. This appears to conflict with the trial testimony of Fitzgerald, McCoy and Smegal to the effect that Fitzgerald was not present at this time.

A It's in that statement. (Tr. 493–494).

On redirect, Ben Atkins asked House whether he had ever shown him (Atkins) any of his injuries which he received in the beating. House indicated that when Atkins had come to visit him at the jail, he had pulled his pants down and shown Atkins bruises. (Tr. 513–514).

Brintley House, brother of Jack House, testified that he had been with Jack House on Saturday afternoon, April 14. He testified they had been at their mother's home and that Jack House was drunk. At around 2:30 p.m., Jack had left and he did not know where he had gone. (Tr. 517). He further testified that his brother had never had any homosexual tendencies. (Tr. 518).

Dorothy Atkins took the witness stand and testified about her initial meeting with Jack House on Wednesday afternoon, April 19, 1973. She stated House had cried and begged her not to let the police beat him any more. (Tr. 526). She also testified that House had shown her a "red place" on his ear and also on his face. (Tr. 527).

Ben Atkins then took the stand and testified about seeing the bruises in House's groin area and the "round mark" on his chest. (Tr. 530–531).

With that, the defense rested. The State presented rebuttal evidence to show that House had not made any request for medical assistance while in jail other than a perfunctory request for aspirin. (Tr. 534–544). It further presented a Fulton County deputy's testimony to the effect that House had stated to him in casual conversation that he was "wild" when drunk. (Tr. 555–556). The State waived opening argument and reserved the right to concluding remarks. Dorothy and Ben Atkins were permitted to divide the closing argument. Dorothy Atkins pointed out that the fingernail scrapings taken from the defendant had been negative. She pointed out that House had no prior criminal record [23] and she complimented the city police force.

Ben Atkins then argued, pointing out that House had been interrogated by the police for approximately five hours before he allegedly confessed. He reread the entire confession to the jury. He attempted to discredit the medical examiner's testimony by pointing out what he felt was improbable testimony. He urged the jury not to judge House harshly merely because he admitted having been drunk and hanging out in the woods.

The prosecutor summarized the evidence in his closing argument. He sharply attacked House's credibility.

The jury was charged and brought back a verdict of guilty on both counts.

D. *Sentencing Phase of the Trial*

After the guilty verdict had been returned the following colloquy between the court and counsel occurred:

THE COURT: All right, Mr. Hayes, any further evidence?

MR. HAYES (Assistant District Attorney): No evidence on behalf of the State, Your Honor, I would like to argue.

THE COURT: Any further evidence, Mr. Atkins?

MR. ATKINS: No sir. Do they go out and deliberate on the sentence?

THE COURT: That's right. Each of you have a right to offer evidence in mitigation or aggravation. Each of you have a right to make closing arguments. You would have a right to the opening and concluding arguments.

(Tr. 611).

Ben Atkins waived opening argument. The Assistant District Attorney argued that the death penalty should be imposed, pointing out the heinous nature of the crimes.

Defense counsel's closing argument consisted of three sentences. It was:

MR. ATKINS: May it please the Court, ladies and gentlemen of the jury, any lawyer who finds himself in this position cannot help but feel somewhere along the way there must be something that he

---

**23.** Actually there was no evidence as to House's lack of a prior record. This Court's

impression, however, is that there in fact was no prior record of substance.

could have done to have brought about a different decision, he always does. I must admit I have never been in this position before.

I think there has been enough dramatics already, and all I would like to leave with you for your own sake is, "Vengeance is mine, saith the Lord." Thank you.

(Tr. 611).

After deliberating the jury found aggravating circumstances and recommended the death penalty. House was sentenced to death on July 11, 1973.

### E. *Post Trial Matters*

1. *The Michael Pitts/Jimmy Fields/Tommy Willoughby Testimony*

Ben Atkins received a number of telephone calls from Jack House's mother after House had been convicted. In one of these telephone calls,[24] she apparently told him that an individual named Michael Pitts, who she believed was homosexual and who allegedly hung around in the DeFoor Avenue woods, was in the Cobb County Jail. (May 28, 1980 habeas Tr. 14). Atkins went to the Cobb County Jail a couple of days later, but Pitts was gone. (May 28, 1980 habeas Tr. 14). Atkins then sent an investigator out looking for Pitts, but the investigator was unsuccessful. (May 28, 1980 habeas Tr. 15). For over a year after that, Dorothy Atkins tried to locate Michael Pitts. (May 28, 1980 habeas Tr. 107). She called the State Board of Corrections, but to no avail. (May 28, 1980 habeas Tr. 108).

Jack House's sister Eloise Jarrard also testified at a habeas hearing on June 15, 1979, that a Tommy Willoughby had reported to her that "Michael Pitts said that Jack did not do it." (June 15, 1979 habeas Tr. 107). Ms. Jarrard testified she had talked with her mother and sisters about this, and that they had been reluctant to tell the Atkinses because Willoughby took dope and "they didn't want to bring the dope in the family." (June 15, 1979 habeas Tr. 107). In any event Ms. Jarrard further indicated that later Willoughby had come back to see her and told her to disregard his previous statement because "I was drunk at the time I told you." (June 15, 1979 habeas Tr. 108).

Although Tommy Willoughby is a relative by marriage of Ms. Jarrard's (June 15, 1979 habeas Tr. 111), and she knows where he lives (June 15, 1979 habeas Tr. 108), he has not appeared as a witness at any of the habeas hearings in this case.

Also after the trial, information was furnished to Dorothy and Ben Atkins, probably by Jack House's mother, concerning an individual named Jimmy Fields. (*See* May 28, 1980 habeas Tr. 15, 108). Ben Atkins' recollection at the habeas hearing was that House's mother suggested Fields might be in possession of information that would make it appear that Michael Pitts was guilty instead of Jack House. (May 28, 1980 habeas Tr. 15). However, the Atkinses were unable to locate Jimmy Fields. (May 28, 1980 habeas Tr. 15–16).

Judy House gave the following testimony about Jimmy Fields at a habeas hearing on May 30, 1980:

A He looked like Jack a lot, similar to him, just like him because of the way he walked, you know.

Q In what other respects did he look like Jack?

---

24. House's mother did not testify at the trial or at any habeas hearings. At a habeas hearing on May 30, 1980, House's attorneys made an offer of proof regarding the testimony Jack House's mother would give if she were called to the stand. In part, it was that prior to the trial, Mrs. House called Ben Atkins and told him she had received a telephone call from Michael Pitts. According to the offer of proof, Mrs. House would have testified if called to the stand that Michael Pitts told her he "was with Jack the day it happened and that I know he didn't do it and I know who did and I will call you back," but that Michael Pitts did not call back. (May 30, 1980 habeas Tr. 374). Both Dorothy and Ben Atkins testified, on the other hand, that the information they received concerning Michael Pitts was after Jack House's conviction. (May 28, 1980 habeas Tr. 63; 106–108). The Court is unable to credit Mrs. House's proffered testimony that she notified Atkins before the trial about the Michael Pitts telephone call, and the Court therefore finds that in fact this information was provided to the Atkinses after the trial.

A The way he wore his hat similar to the way Jack did.

(May 30, 1980 habeas Tr. 355).

A neighbor testified that an individual named Jimmy Fields lived on DeFoor Avenue. (May 29, 1980 habeas Tr. 234–237). She said Fields and his family had lived in the neighborhood "all their lives" (May 29, 1980 habeas Tr. 236). She testified Jimmy Fields and Jack House looked a great deal alike. (May 29, 1980 habeas Tr. 237). However, she said she did not recall his wearing a hat. (May 29, 1980 habeas Tr. 238).

### 2. The Ramsey-Patterson Testimony

Ruby Ramsey and Bobby Patterson, long-time residents of the Jack House neighborhood, testified at habeas hearings in 1980. Neither of the women had testified at the trial. Mrs. Ramsey testified she had seen the Smith and Dunn boys playing in her yard at 5:00 p.m. on Saturday; April 14. Mrs. Patterson confirmed that she had seen two boys in Mrs. Ramsey's yard at or after 5:00 p.m. on that day, although she could not identify the boys by name. The women testified they had called Dorothy Atkins shortly after House's trial and had given her this information, which they deemed quite relevant in light of their understanding that the crimes had been committed at approximately 3:30 p.m. However, court records reflect that the Atkinses did not file a motion for a new trial based on this new information.

On February 7, 1983, the Court heard further testimony concerning this matter. Having considered the evidence, including the transcript of the 1980 testimony, the Court finds the facts are as follows:

On the afternoon of April 14, 1973, Ruby Ramsey saw the Smith and Dunn boys playing in the area around her home.[25] She does not recall the exact time, but testified she believed she had first seen them after lunch, and that they were there "for hours." (May 29, 1980 habeas Tr. 151, 152). Her

daughter Kathy saw the boys also and spoke to them a number of times. (May 29, 1980 habeas Tr. 153).

In the late afternoon on April 14, Mrs. John Allen Dunn came to the Ramsey residence looking frantically for her son Robbie. (May 29, 1980 habeas Tr. 172). Mrs. Ramsey told her she had seen Robbie and his friend Johnny Smith earlier in the afternoon. Mrs. Ramsey has testified she felt sure Mrs. Dunn inquired when she had last seen Robbie, but does not believe she indicated a time to Mrs. Dunn. Specifically, she said:

Q And you don't think you told her the exact time that you had seen the boys?

A I don't think I would have. I might have said something like a couple of hours ago or a good little while ago. . . .

(May 29, 1980 habeas Tr. 172).

Much later the same evening, Mrs. Ramsey heard police loud speakers in the neighborhood, requesting information concerning the whereabouts of the two boys. (May 29, 1980 habeas Tr. 174). She did not call the police. She did, however, call her good friend Bobby Patterson who lived diagonally across the street on Volberg. (May 29, 1980 habeas Tr. 194, 212). Although the record before the Court does not disclose the substance of the conversation, apparently Mrs. Ramsey indicated she or her daughter had seen the Smith and Dunn boys in her yard that day and Mrs. Patterson related in turn that she had seen two young boys, whose names she did not know, playing around Mrs. Ramsey's yard earlier in the day. (May 29, 1980 habeas Tr. 212).

Mrs. Ramsey talked to the police the next morning when they came by in the course of a neighborhood canvass trying to identify a composite drawing. She testified at a habeas hearing that she feels sure she "must have" told the police about seeing the Smith and Dunn boys, although she was

---

**25.** Mrs. Ramsey lives at 1915 Volberg Street. Volberg is a dead end street which runs roughly parallel to Claremont Street. Claremont is shown on State's Exhibit 22. See Appendix filed contemporaneously herewith.

unable to give any details at the habeas hearing. (May 29, 1980 habeas Tr. 177). Ruby Ramsey attended Jack House's trial as a spectator. On July 10, 1973, she heard the testimony which indicated that a man in a black hat had entered the wooded area on DeFoor Avenue at about 3:00 p.m. and was seen exiting it at about 4:00 p.m. After she got home that day, she went to see Bobby Patterson and related to her that the evidence indicated the victims had been killed "between three and three-thirty." (May 29, 1980 habeas Tr. 195). Evidently this caused the two women to further reflect on what they had observed on the afternoon of April 14. It is unclear from the record whether the facts they then recalled on July 10, 1973 were first recalled at that time or had been recalled earlier. The Court infers they were recalled for the first time, because it evidently was only at the trial that Mrs. Ramsey obtained information concerning the apparent time of death of the victims.

Mrs. Patterson recalled on July 10, 1973, that the two young boys she had seen in the Ramsey's yard on the afternoon of April 14 had been there after 5:00 p.m. (May 29, 1980 habeas Tr. 195). Mrs. Patterson's habeas testimony arguably indicates an independent recollection of the time. (May 29, 1980 habeas Tr. 190). However, the Court infers that Mrs. Patterson actually fixed the time by reference to the arrival of her daughter's family that afternoon. She recalled that her daughter's family had left Ellijay to drive to Atlanta that day "somewhere around, between two and three" (May 29, 1980 habeas Tr. 191), and she estimated the trip was about a two hour drive. She then appeared to deduce from that that her daughter and grandson must have arrived at 5:00 p.m. or so. (May 29, 1980 habeas Tr. 189–191). Mrs. Patterson stated she distinctly recalled the two boys exited Mrs. Ramsey's driveway and went up the street shortly after her daughter's family arrived. (May 29, 1980 habeas Tr. 189–190).

At some point Ruby Ramsey decided that the Smith and Dunn boys definitely had been in her yard at 5:00 p.m. on April 14. At the 1980 habeas hearings, she testified as follows:

Q Do you recall seeing Robbie Dunn and/or Johnny Ray Smith on the afternoon of April 14th?

A. Yes.

Q. Can you, please, tell the Court what the circumstances were on your seeing them?

A They had played in my yard off and on. I don't know if they left the yard at any time or not, but they had played. I kept hearing them on the outside there and saw them and they were— we had this little creek in back of my house and my daughter had talked with them several times and they said they were fishing, they had sticks, and were fishing there. But they said they were fishing.

 * * * * * *

Q What time was the last time you recall seeing them on that Saturday afternoon?

A At about five minutes after five.

Q How do you recall exactly what time it was?

A. Because I was going to the grocery store and I had to look at the clock before I went because I usually went earlier than that. I had a headache and I kept laying around that day.

(May 28, 1980 habeas Tr. 136).

Q What time did you tell us yesterday that was?

A I would say right at five o'clock.

Q What pinpoints it in your mind at that time?

A That's when I went to the grocery store.

Q You are absolutely positive you went to the grocery store?

A Oh, yes.

(May 29, 1980 habeas Tr. 154).

At a habeas hearing on February 7, 1983, Ruby Ramsey's daughter Kathy Ramsey testified. She stated that she had gone to the grocery store instead of her mother on April 14, 1973, and that as a result of her discussion with her mother on February 6,

1983, her mother has changed her mind and now agrees with her on this point. (February 7, 1983 habeas Tr. 104).

Returning to the chronology, Mrs. Patterson called Dorothy Atkins on or about July 14, 1973. Ruby Ramsey was at her home when she placed the telephone call. Although both women testified at the 1980 habeas hearings that Mrs. Patterson told Mrs. Atkins she had seen the victims at 5:00 p.m. on April 14 (May 29, 1980 habeas Tr. 162), the Court doubts that was precisely what she said.

Dorothy Atkins went the next day to see Mrs. Ramsey and Mrs. Patterson. Michael Shumacher, a young lawyer who was then sharing office space with the Atkinses, went with her. (May 29, 1980 habeas Tr. 163). He had observed only a small part of the trial,[26] and was only generally familiar with the facts. Mrs. Atkins and Shumacher met with Ruby Ramsey and Bobby Patterson. Also present was Kathy Ramsey, daughter of Ruby Ramsey.[27] Shumacher took notes during the interview. Unfortunately, none of the participants have a ready recall of what was said. Further, there is some lack of certainty as to whether the interview was conducted at one time or in phases. (*See* May 29, 1980 habeas Tr. 253–254).

However, it is clear that after the interview, Michael Shumacher returned to his office and prepared a motion for a new trial.[28] One of the grounds asserted in the motion was the discovery of new evidence. Shumacher also typed up proposed affidavits for Kathy Ramsey and for Bobby Patterson based on his interview notes. He further typed up an affidavit for the signature of Jack House and Dorothy and Ben

Atkins, verifying that the new evidence contained in the affidavits could not have been discovered by the exercise of ordinary diligence prior to trial. The three proposed affidavits were attached to the motion.

Kathy Ramsey's proposed affidavit stated that on the afternoon of April 14, 1973 she had seen Johnny Smith and Robbie Dunn in her back yard. Her affidavit then stated the following:

> I was asked by my mother to go to the grocery store for her. The grocery store closed at 6:00 P.M. that afternoon and my mother was anxious for me to get there before they closed. I have no way of telling what the time was at the time that I was talking to the children in the back yard. I only know they were still playing there when I drove out of the driveway to go to the store.
>
> On my way to the grocery store I went down Claremont and saw Jack House walking towards Defoor on Claremont. He was staggering as though he had been drinking. As I passed by Jack I noticed that the parents of one of the boys were standing in their front yard observing Jack House going down the street.
>
> The only statement that I can make regarding the time that I saw the boys in my back yard and Jack House on Claremont is that it was after 3:00 P.M. on the afternoon of 14 April 1973. That was on a Saturday and was the same day that the two boys were murdered.

Bobby Patterson's proposed affidavit stated the following in pertinent part:

> That on the 14th day of April, 1973, a Saturday, she was sitting on the steps on her house at the above address. The time

---

**26.** Schumacher had observed a part of the *Jackson v. Denno* hearing. (February 7, 1983 habeas Tr. 33).

**27.** Ruby Ramsey has no recollection of her daughter being present. (May 29, 1980 habeas Tr. 163–164). Kathy Ramsey has no recollection of being present. (February 7, 1983 habeas Tr. 98–99). Bobby Patterson thought perhaps Kathy was there. (May 29, 1980 habeas Tr. 222). Michael Schumacher clearly recalled talking to "Mrs. Ramsey's daughter," though

he did not recall her name was Kathy. (May 29, 1980 habeas Tr. 252–253, 257).

**28.** Although both Dorothy Atkins and Michael Schumacher testified Schumacher prepared this motion on his own, a review of the motion indicates Schumacher must have collaborated to some extent with Dorothy or Ben Atkins. A number of the grounds asserted in the motion reflect awareness of testimony at the trial, and the trial transcript was not filed until July 23, 1973.

was approximately 5 or 5:30 P.M. that afternoon.

That, while sitting on the front steps of her house, she happened to look up and observed two small boys in the driveway of the house at 1914 Volberg St., which is located across the street from her house.

That one of the small boys that she observed had platinum blonde hair and wore glasses that appeared to be black or some dark color frames.

That she does not know the two boys who were murdered that day and cannot positively identify the two boys that she saw by name.

That she did not take any special notice of the two boys that she saw and did not speak when she observed them from a distance of approximately 100 feet.

That she placed the time at 5:10 P.M. that afternoon because her daughter and son-in-law had left Ellijay, Georgia at 3 P.M. that afternoon and had arrived at her house some time before she observed the boys in the yard across the street. Taking into consideration the travel time from Ellijay to Atlanta the time that she saw the two boys had to be around 5 or 5:30 P.M. that afternoon.

The affidavit prepared for execution by Jack House and the Atkinses' provided as follows:

Personally appeared before the undersigned authority, JACK C. HOUSE, Movant in Motion for New Trial; BEN S. ATKINS and DOROTHY D. ATKINS, Counsel for Movant; and, individually, and collectively state that the newly-discovered evidence as to the testimony of Mrs. Vernon Patterson, and Miss Kathy Ramsey was not known to have existed prior to or at the time of the trial; that Mrs. Patterson telephoned Dorothy D. Atkins at 12:10 A.M. on Saturday, July 14, 1973, stating that she had been away on vacation, had returned, and had heard about the trial and testimony given in the trial; and that same could not be true.

The subsequent evidence from both this witness and Miss Kathy Ramsey could not have been discovered by the exercise of ordinary diligence prior to the trial.

Ben S. Atkins signed the motion for a new trial prepared by Schumacher. Jack C. House, Ben S. Atkins and Dorothy D. Atkins executed the affidavit prepared for them. Their signatures were notarized by Michael K. Schumacher, Notary Public, on July 24, 1973. A copy of the signed motion, notarized affidavit of the Atkinses and Jack House, plus attached copies of the unexecuted affidavits of Kathy Ramsey and Bobby Patterson were served on the State's attorney.[29]

However, the original motion and the affidavits were never filed with the clerk of the court. See affidavit of William Kimsey, Clerk of the Criminal Division of the Fulton County Superior Court Clerk's office, filed July 9, 1980. Furthermore, the Atkinses never asked Kathy Ramsey and Bobby Patterson to execute their affidavits.

Instead, Dorothy and Ben Atkins filed on July 26, 1973 a form motion reciting the general grounds for a new trial. This motion did not mention newly discovered evidence. In addition, on November 19, 1973, Michael Shumacher, acting "for Ben S. Atkins, attorney for defendant," filed an amended motion for a new trial adding additional grounds for a new trial. This motion did not mention newly discovered evidence either. Shumacher argued the motion for new trial on November 19, 1973. He apparently was then under the impression that the motion for new trial which he had originally prepared had been filed, as he testified in a habeas hearing that he had orally informed Judge McKenzie on November 19 that he was withdrawing the portion of the motion for a new trial which related to newly discovered evidence. (May 29, 1980 habeas Tr. 248).

This sequence of events presents a number of questions. In the first place, exactly what information was given to Dorothy At-

---

**29.** The copy of the motion in evidence as Court's Exhibit "A" was located in this law-yer's file. (February 7, 1983 habeas Tr. 25).

kins and Michael Schumacher in July 1973? Was it the information reflected in the unexecuted affidavits of Bobby Patterson and Kathy Ramsey, or was it the more dramatic testimony given by Ruby Ramsey at the May 1980 habeas hearings that she definitely had seen the victims alive at 5:00 p.m. on April 14, 1973? Also, why didn't Schumacher prepare an affidavit for Ruby Ramsey? Finally, why wasn't Schumacher's original motion for a new trial filed?

Having considered all the evidence bearing on the issue of what information Mrs. Ramsey and Mrs. Patterson gave Dorothy Atkins in July 1973, the Court finds it does not preponderate in favor of House's theory that Mrs. Atkins was told in 1973 that the Smith and Dunn boys were seen alive after 5:00 p.m. on April 14.

Rather, it is more likely that Bobby Patterson told her she believed the two boys she had seen at 5:00 were the victims because of the fact that Ruby Ramsey had seen the victims in her yard earlier that afternoon. The record strongly suggests—and the Court finds—that Mrs. Ramsey's conviction about seeing the Smith and Dunn boys at 5:00 p.m. developed at some time between July 1973 and May 1980, and that her recollection is therefore not too reliable. There are three reasons for this conclusion.

First, the fact that Mrs. Ramsey did not tell Mrs. John Allen Dunn exactly when she had last seen her son suggests Mrs. Ramsey could not recall, even on the day of the occurrence, exactly when she had last seen the boys. Given the circumstances—a frantic mother looking for her missing child—the Court believes this information would have been provided if Mrs. Ramsey had known the answer.

Second, the reference point by which Mrs. Ramsey later established having seen the boys at 5:00—her trip to the grocery store—has now been shown to be faulty by Kathy Ramsey's testimony.

Third, if Ruby Ramsey had told Michael Schumacher in July 1973 that she had definitely seen the victims at 5:00 on April 14,

he surely would have prepared an affidavit reflecting these dramatic facts in lieu of the much more equivocal affidavits prepared for Kathy Ramsey and Bobby Patterson.

At a habeas hearing on February 7, 1983, Michael Schumacher described himself as of 1973 as an "idealistic" young lawyer with only three or four months' experience practicing law when he prepared the affidavits for Kathy Ramsey and Bobby Patterson. (February 7, 1983 habeas Tr. 44). Taking into account the fact that this was a death case, plus the fact that Schumacher evidently believed that the motion and affidavits were in final form (as evidenced by the fact the motion and affidavit of counsel were signed), and taking into account the manner in which the affidavits were prepared (February 7, 1983 habeas Tr. 34), the Court believes that the unexecuted affidavits more likely than not represent—with more precision than any other account—the facts which were related to Michael Schumacher and Dorothy Atkins by Kathy Ramsey, Ruby Ramsey and Bobby Patterson in July 1973.

The Court is cognizant of the fact that at the February 7, 1983 habeas hearing, Kathy Ramsey denied having ever talked to Michael Schumacher and also repudiated part of the contents of her unexecuted affidavit. (February 7, 1983 habeas Tr. 99–102). However, given the fact that she did confirm certain of the affidavit's contents, plus Michael Schumacher's independent recollection of her relating certain of the contents to him (May 29, 1980 habeas Tr. 257), and taking into account the ten year time lapse between that meeting and the date of her habeas testimony, the Court is nonetheless inclined to believe, and does find, that the affidavit prepared for Kathy Ramsey by Michael Schumacher in July 1973 in fact represents what she told him.

Shumacher has indicated he has no recollection of why he did not prepare an affidavit for Ruby Ramsey, except that her testimony was possibly not that helpful. (February 7, 1983 habeas Tr. 35). The Court

infers it was because Mrs. Ramsey's testimony was equivocal and not very helpful.[30]

The Court finds the reason the Atkinses did not file the original of Schumacher's motion for a new trial was that on reflection, they felt it would not be very helpful. In the meantime, however, the service copy had already been mailed.

Both Schumacher and Mrs. Atkins have testified that they did not pursue the matter because they ultimately decided the Ramsey-Patterson testimony could have been discovered in the exercise of due diligence prior to trial. However, that explanation does not make sense. The fact that the Ramseys and Pattersons lived near the victims' and House's homes was obvious when Mrs. Atkins and Schumacher originally went to interview the Ramseys and Mrs. Patterson. Further, counsel's executed affidavit attached to the motion makes it clear that Schumacher was aware of the relevant legal requirement when he originally prepared the motion. Neither the Atkinses nor Schumacher have offered any plausible explanation as to why they subsequently decided that the Ramsey-Patterson testimony could have been discovered prior to trial, or what events triggered that decision.

Mrs. Atkins has also testified that she did not pursue the matter because she believed the evidence was not "strong enough." (November 16, 1982 habeas Tr. 61). This is an objectively reasonable explanation. The two affidavits read together were only mildly helpful to House in establishing that the victims were seen alive after 4:00. At the same time, Kathy Ramsey's proposed affidavit suggests that Jack House had not entered, but rather was approaching the wooded area when she saw him. The pertinent part of her proposed affidavit stated:

On my way to the grocery store I went down Claremont and saw Jack House walking towards DeFoor on Claremont. He was staggering as if he had been drinking. As I passed by Jack I noticed that the parents of one of the boys was standing in their front yard observing Jack House go down the street.

The only statement that I can make regarding the time I saw the boys in my back yard and Jack House on Claremont is that it was after 3 p.m. on the afternoon of 14 April 1973. That was on a Saturday and was the same day that the two boys were murdered.

As previously related, John Allen Dunn, father of Robbie Dunn, testified at trial that he had seen a man in a black hat staggering down Claremont Street toward DeFoor Avenue on April 14; that his son and Johnny Smith had shortly thereafter followed in the same direction and did not return. (*See* page 1121, *supra*). The Court infers that John Allen Dunn is the person referred to in Kathy Ramsey's affidavit and that Kathy Ramsey therefore saw the Smith and Dunn boys before, not after, the time the murders allegedly were committed.

Kathy Ramsey's affidavit was harmful to House's case in another respect. It made a positive identification of Jack House as the person staggering down the street. The neighbors who testified at trial had merely said the person was drunk and wearing a black hat.

The Court infers that the damaging aspect of Kathy Ramsey's proposed affidavit was not apparent to Michael Schumacher because he had not heard the evidence at trial. The Court further infers that the Atkinses, or one of them, realized the negative implication of this evidence only after signing the motion, and after the service copy had been inadvertently mailed. Apparently they did not inform Schumacher of

---

**30.** The Court notes and accepts the Magistrate's finding that Ruby Ramsey and Bobby Patterson are "considerable witnesses in terms of their credibility" (May 30, 1980 habeas Tr. 453), and finds the same to be true of Kathy Ramsey. Nevertheless, the Court believes the unexecuted affidavits—which were prepared soon after the occurrence in question—more likely represent the facts as they were related to Michael Schumacher in July 1973. After a lapse of from seven to ten years, witnesses can be sincere, honest, and totally convinced—yet wrong.

the decision to omit filing the original motion. Perhaps the suggestion was later made to Schumacher by the Atkinses—or one of them—that the matter of the new evidence was not worth pursuing because it could have been discovered before trial.

When Bobby Patterson did not hear further from Schumacher or Mrs. Atkins, she contacted the prosecutor, Tom Hayes, and told him her story. When Hayes failed to take action, she contacted a newspaper reporter.

On December 10, 1973, the amended motion for new trial was denied. Thereafter, an appeal to the Georgia Supreme Court followed. House was represented in this appeal by Ben Atkins and Michael Schumacher. It was unsuccessful, the conviction being affirmed on April 14, 1974. *House v. State*, 232 Ga. 140, 205 S.E.2d 217 (1974). Certiorari was denied on July 6, 1976. *House v. State*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). (Justices Brennan and Marshall were of the opinion that certiorari should be granted).

### F. *Habeas Proceedings*

In November 1976, House filed a petition for a writ of habeas corpus in the Superior Court of Fulton County. He was represented by Dorothy and Ben Atkins, and additionally by counsel having special expertise in death penalty cases—Anthony Amsterdam, Jack Greenberg, John R. Myer, and others. Numerous constitutional claims were urged on the court, but these did not include any claim that Dorothy and Ben Atkins had rendered ineffective assistance of counsel. The petition was heard by Judge McKenzie and denied on December 14, 1976. The order denying the petition was duly appealed and affirmed on June 7, 1977. *House v. Stynchcombe*, 239 Ga. 222, 236 S.E.2d 353 (1977); certiorari was denied. *House v. Stynchcombe*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

On August 29, 1978, House filed a petition for a writ of habeas corpus in this Court. This petition covered the same grounds previously presented to the state court. Dorothy and Ben Atkins did not appear as counsel. Rather, the petition was filed by the aforementioned new counsel. This petition did not claim that House had received ineffective assistance of counsel at the trial either. Evidentiary hearings were held on June 13–15, 1979.

On March 28, 1980, House filed a Motion for Leave to Supplement Petition for Writ of Habeas Corpus. It asserted that the Atkinses had been ineffective in pretrial investigation and also at the sentencing stage of the trial. A Notice of Waiver was filed on April 2, 1980, reflecting the State's agreement to waive any contention that House had not exhausted state remedies as to the new claims asserted in the motion.[31]

House's brief in support of his Amended Petition was filed on July 31, 1980. The brief did not merely urge that House had lacked proper representation in pretrial investigation and at trial, however. It also argued that the Atkinses had incompetently failed to file a motion for new trial based on the "Ramsey-Patterson" testimony, and that this failure provided an independent basis for issuance of a writ of habeas corpus. Notwithstanding this discrepancy, the State did not assert—and to this day has not asserted—that House failed to exhaust his state remedies with respect to this additional claim.[32]

Evidentiary hearings were held before then-Magistrate J. Owen Forrester. Dorothy and Ben Atkins testified to numerous things they wished they had done on behalf of House at the trial and that they had felt ill-prepared to try the case.

Further, evidence was introduced proving that Judy House indeed has blood type A

**31.** In August 1979, House had filed a Successor Petition for Writ of Habeas Corpus in the Superior Court of Tatnall County. It raised a claim of ineffective counsel at the sentencing stage only. The petition was denied as successive on January 31, 1980. House has never filed a state habeas claim pertaining to the Atkinses'

alleged incompetence in pretrial investigation or in failing to file a motion for a new trial.

**32.** The Court specifically raised this inquiry with counsel at a reported in-chambers hearing on September 13, 1982, and the State voiced no objection.

positive for M antigen of the M–N series— the same as the blood spot found on House's trousers. Ruby Ramsey and Bobby Patterson testified. The thrust of their combined testimony was that the Smith and Dunn boys were playing in the area around Ruby Ramsey's house after 5:00 p.m. on the day in question.[33]

On July 10, 1981, a Magistrate's Report and Recommendation issued in which it was recommended that a writ of habeas corpus be granted because of the Atkinses' failure to file a motion for new trial based on the Ramsey-Patterson testimony, and because the Atkinses had rendered ineffective assistance of counsel at the sentencing stage. The State's response was to file, on July 23, 1981, a Motion to Remand to Magistrate for Reconsideration of Report and Recommendation. A proposed order was filed along with the motion; on July 23, 1981, the order was entered ex parte by Judge Newell Edenfield of this Court. The order remanding the case to the Magistrate contained no information as to why the case was being remanded or for what purpose. However, a transcript of proceedings held before Magistrate Forrester on July 27, 1981, reflects the parties' understanding that Judge Edenfield was concerned that Judge McKenzie (the trial judge) had never had an opportunity to consider a motion for new trial based on the Ramsey-Patterson testimony. The transcript appears to reflect his intention that the case be sent back to the Superior Court of Fulton County for possible consideration of an extraordinary motion for new trial to be filed by House.

Further briefs were then filed before the Magistrate concerning the possibility of "remand" to the Superior Court. House's lawyers vigorously opposed any "remand." The State urged that it be done, citing the State Court's greater ability to consider the Ramsey-Patterson testimony within the context of the entire trial.[34] On January 27, 1982, a further Magistrate's Report and

Recommendation was issued in which the Magistrate's prior recommendation that a writ of habeas corpus issue was reaffirmed.

After Magistrate Forrester became a United States District Judge in January 1982, he was assigned all cases previously assigned to Judge Edenfield, who died in late December 1981. In order to avoid any questions of procedural irregularity, Judge Forrester asked the undersigned district judge to rule on any objections either side might file to the aforementioned report and recommendation. A case swap then resulted in the instant case being assigned to the undersigned judge.

Further evidentiary hearings were held before the undersigned on November 16, 1982, January 14, 1983 and February 7, 1983. Those testifying were: Jack C. House, Dorothy Atkins, Ben Atkins, Judy House, Michael Schumacher, Thomas Hayes, and Kathy Ramsey.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO THE INEFFECTIVE ASSISTANCE CLAIMS

House contends the Atkinses provided ineffective assistance of counsel in a number of ways. Each of his contentions is considered individually hereinafter.

### A. *Pretrial Investigation and Preparation*

■ House was entitled under the Sixth Amendment to "reasonably effective assistance" from the Atkinses given the totality of the circumstances. *Herring v. Estelle,* 491 F.2d 125 (5th Cir.1974), quoting *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960), *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). This standard is applicable to the pretrial, as well as the trial phase. *Goodwin v. Balkcom,* 684 F.2d 794 (11th Cir.1982).

---

**33.** Other witnesses who testified were: Judy House, Edward Garland, Thomas W. Hayes, Michael Schumacher, Bruce P. Kirwan, and Elizabeth Thomason.

**34.** The State never explicitly urged that there had been a failure to exhaust state remedies, however.

1. *Interviews with Family Members*

House contends the Atkinses did not adequately interview members of his family prior to the trial. He contends that if they had, they would have learned of the allegedly exculpatory Michael Pitts/Jimmy Fields/Tommy Willoughby testimony, and further that they would have learned from Mrs. Judy House that she had heard Jack House scream while she was waiting for him at the police station on April 15.

House has the burden of proving this claim by a preponderance of the evidence. *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) (Unit B).[35] Having considered the evidence, the Court finds it does not preponderate in House's favor on this claim.

The initial reason is that the evidence concerning what House did or didn't tell his counsel about the events of April 14 is too hazy. The only definite evidence—that pertaining to House's initial meeting with Dorothy Atkins—in fact tends to suggest that House gave Mrs. Atkins none of the specific details about his activities on the afternoon of April 14 which he later related to the jury at the trial. Before the Court can determine the appropriate parameters of the Atkinses' duty to interview family members, it needs to know what information House gave his counsel.

Given the fact that House did not give Dorothy Atkins any information of substance concerning where he had been on the afternoon of April 14, it appears to the Court that she responded in an appropriate manner. She asked members of the family to assist her in getting together whatever information was available concerning House's whereabouts. In this regard, Mrs. Atkins testified at the habeas hearings that she did interview members of the family, and the Court credits her testimony. Basically, the problem was that they, also, did not know much about House's whereabouts on the afternoon of April 14. The two

family members who claimed to have such knowledge—Bobby House and Judy House—were called to the witness stand at trial.

House's attempt to discredit the thoroughness of Dorothy Atkins' pretrial interviews with family members rests on the testimony of Judy House, Jack House's ex-wife[36] and an offer of proof as to what Jack House's mother would say if called to the witness stand. The Court notes that in the 1980 habeas hearings, Dorothy Atkins was not asked a single question concerning her interviews with family members, although her husband clearly stated in his prior testimony that this part of the case had been handled entirely by her.

Judy House testified at the 1980 habeas hearings that the only time she ever saw Dorothy Atkins was at their initial interview when Mrs. Atkins was hired, and then at the trial. She did state she had called Ben Atkins prior to the trial to see if he had been able to find any evidence. (May 30, 1980 habeas Tr. 349–350). She also testified she was not told before she testified at the trial what she was going to be asked. (May 30, 1980 habeas Tr. 351). Judy House testified that while she had been at the police station during her husband's interrogation, she thought she had heard him yell "Help." (May 30, 1980 habeas Tr. 352). She further testified that she knew Jimmy Fields, who used to spend a lot of time at her sister-in-law's, (May 30, 1980 habeas Tr. 354), and that Fields looked a lot like Jack House. (*See* page 1123, *supra*).

Judy House said she had not told the Atkinses about Jimmy Fields, "because they never asked me anything." (May 30, 1980 habeas Tr. 356).

Judy House's testimony to the effect that she did not know before she got on the witness stand what she was going to be asked is discredited. It is quite obvious from the transcript of the trial that she did

**35.** *See Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), adopting as precedent post-October 1, 1981 decisions of a Unit B panel of the Former Fifth Circuit.

**36.** Judy House is now the wife of Jack House's brother, Brintley (Bobby) House. (February 7, 1983 habeas Tr. 81–82).

know. The most telling example is provided in the following sequence of questions and answers:

Q (Referring to the day prior to House's arrest) Now, did anything take place between you and Jack that morning in the morning?

A Well, yeah, we had an intercourse that morning and—

Q Well, what was your physical condition?

A Well, I was spotting and I was bleeding a little bit. I was menstruating a little bit so after that is when we went to town.

Q Did you—did he take his pants off?

A No, he kept his pants on.

(Tr. 416–417).

Furthermore, Dorothy Atkins testified at a habeas hearing that she discussed the referenced matter with Judy House before Mrs. House testified. (November 16, 1982 habeas Tr. 74). This was denied by Judy House (February 7, 1983 habeas Tr. 86–87), but Mrs. Atkins' testimony is credited.

Judy House's habeas testimony concerning hearing her husband yell at the police department is also discredited. As noted Mrs. House was present at the initial interview with Dorothy Atkins, and also talked to Ben Atkins on the telephone prior to the trial. She knew prior to trial that Jack House contended he had been beaten by the police. (February 7, 1983 habeas Tr. 85). She told Dorothy Atkins during their first interview that she had been at the police station during the time her husband was being interrogated. (May 28, 1980 habeas Tr. 98–99). It is inconceivable to the Court that Judy House would have failed to mention this obviously relevant fact to counsel, if it were true, and the Court therefore concludes that her present testimony is fabricated and had never occurred to her at the time of trial.

As mentioned above, House also seeks to establish the inadequacy of Mrs. Atkins' pretrial interviews with family members through an offer of proof from his mother. The portion of the offer of proof which relates to Dorothy Atkins' pretrial investigation is that other than Mrs. House's initial interview with Dorothy Atkins, she had no personal contact with the Atkinses except for "a number of telephone calls." (May 30, 1980 habeas Tr. 373–374). However, this does not establish an inadequate discussion of the facts with family members either. In order to show that Mrs. Atkins' interviews with family members were inadequate, it would be necessary for House to introduce evidence as to exactly what these conversations consisted of. Also, it would be necessary for him to show the Court that Mrs. Atkins had some reason to believe that Jack House's mother had information which might be helpful to him, and then was remiss in failing to follow up.

That Dorothy Atkins did interview members of House's family is evident not only from her testimony, but also from the trial transcript. For example, Brenda Lee Ray, a niece of House's, testified at the *Jackson v. Denno* hearing. She testified about an unpleasant experience she had had with Sergeant Fitzgerald when she had come to the police station to report a rape. (Tr. 228–233). This testimony must have been the result of an inquiry made prior to trial; it is not the sort of testimony which would turn up by happenstance during the course of examination of a witness. Similarly, certain comments made by Ben Atkins during the trial reveal that either he or Dorothy Atkins had interviewed Bobby House before he was called to testify. *See* Tr. 245, in which Atkins appears to indicate that a prior interview with Bobby House had led him to believe that Bobby House had not remained at the police station during Jack House's interrogation. Also, the Court notes that Ben Atkins' direct examination of Judy House during the *Jackson v. Denno* hearing does not appear to be a "discovery" type of interrogation which reflects absence of familiarity with the facts. Mrs. House was called to the stand for brief examination, during the course of which she indicated Jack had been drinking prior to his arrest. (Tr. 194). Also, Nancy Jones, sister of Jack House, was called during the trial and testified about House's having lived in

his neighborhood all his life, the fact that he had three small children, and that he was married. (Tr. 408–412).

The Court does not believe it is reasonable to infer that Dorothy Atkins' failure to learn of the Michael Pitts/Jimmy Fields/Tommy Willoughby testimony before trial was due to lack of proper inquiry on her part. The logical beginning point for Mrs. Atkins' investigation was her own client, then members of the family in an attempt to see what could be learned about Jack House's whereabouts on the afternoon of the crime. Nothing has been indicated to this Court which should have reasonably suggested inquiry by the Atkinses into who, other than their client, might have committed the crimes. Moreover, it does not appear that House ever suggested to the Atkinses, or to anyone else for that matter, that he was with someone named Michael Pitts on the day the crimes were committed. Indeed, his rather comprehensive narrative of the events of April 14 appears to exclude such a possibility, unless Pitts happened to have been in the woods with House during the time when he was allegedly asleep.

Within the framework of the evidence which developed at trial, the Jimmy Fields "look-alike" testimony would not have had any significance either. This is because none of the neighbors who testified about seeing a man walk down Claremont Street, then up Mantissa Street, on April 14 identified the man as House or even as a person resembling House. They all simply said the person was drunk and wearing a black hat. It was House's own statement to the jury, plus his brother Brintley's testimony about the time frame, and House's hat itself, which tended to confirm that House was the individual in the black hat. The implicit suggestion that this case presents a possible issue of Jimmy Fields being mistaken for House finds no basis in the record.

### 2. Interviews with Police and Other State Witnesses

House contends the Atkinses were ineffective in failing to interview the witnesses listed on the indictment. There appears to be no question about the fact that they did not interview any of these witnesses.

The Atkinses clearly had a duty to investigate facts reasonably available to them, independently of their client. *Bell v. Georgia*, 554 F.2d 1360 (5th Cir.1977) (per curiam). Without a doubt, their failure to interview or otherwise obtain information from any of the State's witnesses falls below the standard required of reasonably effective counsel. At a minimum, inquiry should have been made of the police officers, the county medical examiner, and the crime lab personnel.

### 3. The Search for Witnesses

House contends the Atkinses were ineffective in failing to canvass the neighborhood for witnesses who might have exculpatory information, including possible alibi witnesses. At first blush, his claim has some appeal. After all, he did tell Dorothy Atkins at their initial interview that he had simply been wandering around the neighborhood on the afternoon in question. His brother Brintley indicated Jack House had gone wandering off at some point after 2:30 p.m. Therefore, it does seem, considering that evidence alone, that a neighborhood canvass would have been reasonable, to attempt to see if anyone had information as to exactly where House had been on the afternoon of April 14 after 2:30 p.m. The problem with this approach, however, is that it ignores the facts House was aware of prior to trial, but which he apparently did not tell the Atkinses—that he had traveled a specific route on the afternoon in question (which was established both by the State's witnesses and by House's own testimony) and that he allegedly then fell asleep in the woods for an indefinite period of time. Although counsel's duty to investigate is framed by the facts known or reasonably available to counsel, the Court does not believe a client should reap benefits in a habeas case from sandbagging his lawyer. Therefore, the Court considers that the scope of the Atkinses' duty to investigate should be more narrowly circumscribed by

the more specific facts revealed in House's trial testimony.

This perspective disposes of any contention that the Atkinses should have canvassed the neighborhood for alibi witnesses. House did not contend at trial that he was any place other than the wooded area during the time frame at issue in this case. Further, he testified he was alone. Therefore the nature of House's story was such that there was no apparent source available for verifying it.

Secondly, it was not unreasonable for the Atkinses to fail to make a "needle in a haystack" type of search given the facts of this case and the fairly populous nature of the neighborhood. According to the 1973 City of Atlanta Directory, the approximately six block square area bounded on the south by Davis Circle, on the north by Seaboard Avenue, on the west by DeFoor Avenue, and on the east by Volberg Street, contained, as of 1973, approximately 150 buildings.[37]

### 4. Discovery

House contends the Atkinses were ineffective in failing to seek discovery. This contention has been disposed of by the Court's earlier findings. There was no discovery available as a matter of right. The Atkinses were only entitled to the witness list contained on the indictment.

However, the Court has made a finding that Ben Atkins was advised of the content of the crime lab reports just prior to trial. It assumes without deciding that the Atkinses did not tell House before trial that the police had confirmed that the spot on his pants was blood and that it was the same blood type as that of one of the victims. The Atkinses were obligated to provide this information to their client. The fact that House already knew about the spot, and knew the police suspected it was blood, but did not tell his counsel about the spot, did not relieve the Atkinses of this obligation. The Court finds their assumed failure to provide him with this information falls below the standard required of reasonably effective counsel.

### 5. Photographs of House's Bruises

House contends the Atkinses were ineffective in failing to take photographs to memorialize the bruises he contends he received at the hands of the police. His contention is that if photographs had been taken, they would have materially assisted the judge and the jury in determining the voluntariness of the confession.[38]

■ The role of the habeas court is not to reweigh matters already determined by the trial judge. Here, the trial judge did make a determination after hearing evidence that House's confession was voluntary. However, he did not make a specific determination as to whether or not there were bruises on House's body and if there were, what the source of those bruises was. His only determination was that the confession was "voluntary." Moreover, the Court does not see how it is possible to resolve this particular claim without making findings of fact. It would be foolish to determine that counsel was ineffective in failing to photograph bruises if the bruises did not exist or if they were of a type such that memorializing them in a photograph would not have assisted the trier of fact. Therefore, the

---

37. This fact is not contained in the record. However, the Court believes the City Directory is a sufficiently reliable source for the Court to take judicial notice of the information contained therein. *See* Fed.R.Evid. 201; McCormick, Evidence § 330 (1972); Weinstein's Evidence, ¶ 201[03] n. 26 (1982). The referenced information is drawn from Atlanta City Directory Co.'s Atlanta (DeKalb and Fulton Counties, Ga.) City Directory, Atlanta Street & Avenue Guide at 100 (for Claremont St. N.W.), 122 (for Davis Cir. N.W. & Davis Pl. N.W.), 123 (for DeFoor Ave. N.W. between Davis Cir. & Sea-

board Ave. N.W.), 269 (for Mantissa St. N.W.), 399 (for Rhomboid St. N.W.), 416 (for Seaboard Ave. N.W.), and 462 (for Volberg St. N.W.) (Atlanta City Directory Co. 1973).

38. As previously noted, the judge made a determination that the confession was voluntary after a *Jackson v. Denno* hearing out of the presence of the jury. However, the judge also instructed the jury that it had to determine whether the confession was freely and voluntarily given before considering it.

Court will now proceed to make the requisite finding.

Three individuals have testified at habeas hearings concerning the subject of bruises on House's body after his interrogation and confession: Jack House, Dorothy Atkins and Ben Atkins. The undersigned Judge has not heard testimony from Sergeant Fitzgerald, or Detectives Smegal or McCoy, who testified at the trial concerning the subject of House's bruises, but it is noted that their trial testimony and the testimony of Detective McCoy and Sergeant Lee as to 1980 habeas hearings was basically to the effect that House had no bruises.[39]

As previously noted, Dorothy Atkins testified before the jury at trial that she had seen a "red place" on House's face and ear. (Tr. 527). Her testimony at the habeas hearings regarding marks on House's body has been more wide-ranging though less specific. *See* May 28, 1980 habeas Tr. 99 ("... he showed me the bruises and contusions on his head, body, shoulders, legs...."); November 16, 1982 habeas Tr. 54 ("... on the side of his face and head and his legs, his shoulders and body").

As noted above, Ben Atkins testified at trial that the facial bruises Dorothy Atkins had seen on the preceding day were gone when he visited House at the county jail. (Tr. 531). However, Atkins testified at trial that he viewed a round spot on House's chest "where he had been punched with something." (Tr. 199–200). He further testified that House had pulled down his pants and shown him "bruised places on his legs and up to his groin. There were several, I didn't count them, but there were several blue bruised spots there." (Tr. 199–200).

Ben Atkins has testified before this Court at three habeas hearings. He has not given direct testimony that he actually saw any bruises in Mr. House's groin area. At a hearing on May 28, 1980, the following testimony was given:

**39.** Detective Smegal may have acknowledged the presence of a small round mark on House's chest, however. Atkins asked him at trial what

Q Do you recall what Mr. House had told you when you met with him at the jail about those bruises?

A Yes.

Q What did he say?

A What I specifically remember that I saw was a little circular shaped bruise right here (indicating) and he said that a gun was stuck up there like that (indicating) by one of the officers and that it made that bruise and that that was one of the reasons that he signed the confessions. It was done to get his confession. (May 28, 1980 habeas Tr. 13).

At a later point in the same habeas hearing, Mr. Atkins testified as follows:

Q What did you understand the significance of the bruises or marks on his body to this case to be?

A Well, I understood them to be that in order to get a confession out of him, a signed confession out of him that he had been overly pushed into this and had been beat up and that was substantially what I heard, that he was beat up pretty badly and these were bruises and as I said the one that I saw, some of the bruises were—that my wife saw earlier were gone but the one I saw was where he said that they stuck a gun right there.

Q Circular bruise?

A Circular bruise. I saw that bruise myself. (May 28, 1980 habeas Tr. 86–87).

At a further habeas hearing on January 14, 1983, Mr. Atkins testified as follows concerning this same subject:

Q Can you remember anything he told you at that interview?

A No, Ma'am, I can't. I will just have to admit I can't remember anything specifically except I have a clear picture of the mark on his front here.

Q Do you remember anything else about his physical condition that was displayed to you at that time other than this round mark?

caused the bruise and Smegal replied he did not know. (Tr. 149).

A No, I don't.

Q Did Mr. House display any other parts of his body to you at that time?

A Not that I recall.

(January 14, 1983 habeas Tr. 12).

\* \* \* \* \* \*

Q You have testified at one or more previous hearings held in this case that when you went to see Mr. House at the jail, he dropped his trousers and you observed bruises or something similar to that on the upper part of his legs.

A Ma'am, if I so testified, I remembered it at that time, and I do not remember it now, and so consequently I am sure that I did if I so testified. I just don't recall now the details of my visitation to him. I don't know why. I guess it is because of the hideousness of that bruise up here that I recall it more than anything else, but I do believe now that you mention it that there were bruises, and if he dropped his pants and I said so, then I am sure he did, and I just don't recall that.

(January 14, 1983 habeas Tr. 14–15).

At the *Jackson v. Denno* hearing before the trial judge, Jack House testified Sergeant Fitzgerald slapped him, hit him in the stomach, knocked his head up against the wall, punched him with a gun, and kicked him in the groin. (Tr. 164–180). He reiterated the same testimony later before the jury. (Tr. 449–456).

House testified at a habeas hearing on November 16, 1982. He testified that when he first saw Mrs. Atkins at the jail, he had blood running down his chest. (November 16, 1982 habeas Tr. 20). He testified he showed her the place on his chest "where the man had beat me with a pistol." (November 16, 1982 habeas Tr. 21). He testified the police used his head "for a football," explaining that the police had kicked his head. He testified he was bleeding in the groin area at the time, (November 16, 1982 habeas Tr. 21) but said he did not show that to Mrs. Atkins.

House stated that when Ben Atkins came to visit him a couple of days later, "I had

water and blood running out of my ear," (November 16, 1982 habeas Tr. 24) and that he dropped his pants and showed Atkins his groin area. House testified his scrotum was swollen to "about three times its size," (November 16, 1982 habeas Tr. 25) and that the affected areas on his legs could be described as follows:

Well, like I say, it was black and blue. You could call it a bruise or scratch either one. It was real red.

(November 16, 1982 habeas Tr. 26).

In response to a question as to what else he showed Atkins regarding the condition of his body, House replied:

A Right here in the middle of my chest where I was beat, and they wasn't no point in trying to show him any bruise on my head because they was holding me up against the wall and slapping me, holding my forehead and slapping my head against the wall. He couldn't see no bruise on my head but he could see this big one right in the middle.

(November 16, 1982 habeas Tr. 26).

House's testimony given before this Court on November 16, 1982 regarding the nature of his alleged bruises is noted to be remarkably more lavish than any testimony given at trial and at variance with the Atkinses' habeas testimony. The Court finds him not to be believable, and discredits his testimony.

At a habeas hearing on February 7, 1983, the Court inquired of the prosecutor, who was present, whether any photographs had been made of House on the day of his interrogation. This caused a search to be made, which produced the photographs now admitted into evidence as Court's Exhibits D and D1–9. After House and his attorneys had conferred concerning these photographs, House took the witness stand and testified about them. He testified that Court's Exhibits D, plus D3 through D9 inclusive were taken shortly after his arrival at the police station. He further testified that D1 and D2 were taken at a later point in time, after the police had beaten him. He testified that the small reddish mark shown in the middle of his chest on

Court's Exhibit D2 was the round mark he had shown to Ben Atkins, and which had been caused by the barrel of a revolver being pressed into his chest. (February 7, 1983 habeas Tr. 111–114, 117–118).

Court's Exhibit D2 shows a small, faint red mark in the middle of House's chest. This Exhibit and Court's Exhibit D1 show what appear to be very slight scratch marks on House's back and chest, but there are no identifiable bruise marks. If House's testimony concerning his alleged bruises had any credibility with the jury, it would have been totally destroyed by these photographs.

Having considered the foregoing testimony, plus the photographs, the Court does find that the round mark on House's chest was unremarkable and not helpful to him in establishing his claim that he had been beaten by the police. Indeed, a photograph would have been damaging to House's case. Similarly, the Court further finds that the red place on House's face and ear noticed by Dorothy Atkins was insignificant,[40] as evidenced by the fact that it had disappeared by the time Ben Atkins arrived at the jail. Finally, the Court finds, based on Ben Atkins' inability to remember anything about the bruises in House's groin area that any such marks seen by Atkins were insignificant also, if indeed they were seen at all.

Based on the foregoing discussions, the Court finds, therefore, that the Atkinses were not ineffective in failing to make photographs.

### 6. *Miscellaneous*

Finally, House has urged the Atkinses were ineffective in failing to perform miscellaneous other pretrial activities.

He urges they incompetently failed to visit the crime scene. However, no specific showing has been made as to what helpful insights they would have gained had they done this. Indeed, the Court notes the prosecutor's testimony that in ninety-five percent of his cases, he does not visit the crime scene either. (May 30, 1980 habeas Tr. 431).

House urges that the Atkinses failed to develop available defenses on his behalf. However, he has not identified any available defenses which could have been, but which were not, developed.[41]

Finally, House urges that the Atkinses were incompetent in failing to consult a medical expert to see whether or not a person as drunk as House was could have committed sodomy and also whether it was probable that a nonhomosexual would commit sodomy. However, no offer has been made by House of any testimony which could have been obtained by the Atkinses, had they chosen to pursue this matter. The County Medical Examiner, Dr. Stivers, testified that a drunk man's ability to commit sodomy is a function of just how drunk he is and that a staggering gait does not necessarily mean that a person could not commit sodomy. The Court is unwilling to blindly assume that testimony more favorable to House on this particular point exists. With respect to House's argument that the Atkinses should have located a medical expert who could have given testimony regarding the possibility that a nonhomosexual would have sodomized the boys, there similarly has been no showing. It is obvious that a nonhomosexual would have the physical capacity to commit such an act; whether he might be motivated to do so is another question. It is not apparent what sort of expert testimony might have been available in this regard.

### B. *The Effect of the Atkinses' Deficient Pretrial Investigation on House's Conviction*

■ As is set forth above, the Court finds the Atkinses did not provide reasonably ef-

---

40. Mrs. Atkins' habeas testimony that she saw other bruises is discredited. The Court believes this is due to confusion of the event and prior discussions of the event, not intentional falsehood.

41. House has identified certain alleged defenses: the "coerced confession defense," the "blood spot defense," and the "physical impossibility defense." These are not defenses. The Atkinses' handling, or non-handling of evidence pertaining to these factual issues is discussed elsewhere in this Order.

fective assistance to House in that they failed to interview or otherwise obtain information concerning House's interrogation by the police officers. Further, as set forth above, the Court assumes, for purposes of this Order, that the Atkinses improperly failed to discuss the blood test results with Jack House. The question now is whether these failings are of such a nature that House's present conviction is unconstitutional.

■ Under the law of this Circuit, if the Court finds that counsel's representation was not merely deficient or inadequate in many or most respects, but was functionally equivalent in every respect to having no representation at all, then it is not necessary for a habeas applicant to show that he was prejudiced by his counsel's failings. *Adams v. Balkcom*, 688 F.2d 734, 739 fn. 1 (11th Cir.1982). Although the Atkinses improperly represented House in certain respects during the pretrial phase, the Court finds these failings did not sink to the level of having no representation at all. As previously noted, the Atkinses did interview House and members of his family. They filed a motion to suppress his confession and presented evidence at the motion hearing. They presented House's version of the facts to the jury. After his conviction and death sentence, they filed a motion for a new trial, and subsequently an amendment thereto. They also filed a motion to reduce his sentence.

In a case where counsel's representation is below proper standards in certain respects, but where the representation was not the functional equivalent of no representation, it appears the relevant standard is that set forth in *Washington v. Strickland*, 693 F.2d 1243 (5th Cir.1982) (Unit B), which requires the habeas applicant to demonstrate that counsel's failings worked to his "actual and substantial disadvantage"; if he is successful in making this showing, the writ must be granted unless the State proves that counsel's ineffectiveness was harmless beyond a reasonable doubt. *Id.* at 1262.

House has not shown any actual prejudice arising from the Atkinses' failure to interview the police officers and detectives prior to trial. Therefore that failure cannot be a basis for habeas relief from his conviction.[42]

As previously mentioned, the Court has found the Atkinses were less than reasonably effective, assuming that they failed to inform their client of the results of the lab tests on the blood spot found on House's trousers. Evidently, they learned this information only shortly before trial. Their duty at that point was to inform him of this development to see what assistance, if any, he might be able to provide in explaining the source of the blood spot.

If House had then told his lawyers of his idea that the spot might be his wife's menstrual blood, then reasonably effective counsel certainly would have proceeded to have Judy House's blood typed. This would have yielded helpful evidence which would have been admissible at trial. It is an objectively established fact at this point that Judy House, as well as one of the victims of the crime, has the same type of blood as that found in the spot on House's trousers.

As previously stated, the law of this Circuit requires this Court to now determine whether the Atkinses' failure to obtain and present evidence of Judy House's blood type resulted in "actual and substantial disadvantage" to the presentation of House's defense. If the Court finds it did, then a writ of habeas corpus must issue to House unless the State proves this failure was harmless "beyond a reasonable doubt".

The meaning of the phrase "actual and substantial disadvantage" is not self-evident. One interpretation might require considering whether the additional evi-

---

**42.** Undoubtedly whatever difficulty might have been inherent in interviewing these officers in 1973 has been multiplied many fold over time, so that meeting this requirement is virtually impossible, regardless of what the facts are.

Nonetheless, the burden of proof is on House. Alleviating this burden would violate the holding of *Washington, supra,* and could run afoul of Rule 9, 28 U.S.C. § 2254.

dence, taken in the context of the evidence as a whole, would have materially altered House's chances of getting convicted by a rational jury. However, this approach would render the second step of the referenced inquiry superfluous.

Therefore, it seems to the Court that "actual and substantial disadvantage" must necessarily be a theoretical inquiry which in this case would address the nature of the omitted evidence, but not its quality or its relationship to the other evidence in the case.[43] Since House's claim herein was that he had absolutely nothing to do with the commission of the crimes, the Court believes that "actual and substantial disadvantage" per *Washington, supra,* would accrue to him if the omitted evidence were exculpatory in nature—*i.e.,* evidence inconsistent with guilt. It would not be evidence which would merely bolster credibility or tend to impeach.[44]

The evidence that Judy House's blood was the same type as that on House's pants was not exculpatory. Even if the jury believed his explanation that the blood spot had gotten on his pants while he kept his pants on during intercourse with his wife, that is not inconsistent with an adjudication of guilt. Therefore, while the omission of the evidence caused some actual prejudice to House (because it was helpful evidence), the prejudice was not substantial.

If it is appropriate for the Court to evaluate the effect of the Atkinses' failure to obtain and introduce evidence of Judy House's blood type within the context of the trial as whole, then it is quite clear that the evidence falls short of showing substantial prejudice.

In these habeas proceedings, House has sought to characterize the State's case against him as a circumstantial evidence case. However, it clearly was not. The most critical item of direct evidence, of course, was House's rather detailed confession. Undoubtedly the confession alone was sufficient to determine the outcome of the guilt/innocence phase of the trial.

The next most damaging item of direct evidence was Detective Smegal's testimony concerning how House had taken him, Detective McCoy and Sergeant Lee to the crime scene and showed them where he had left the victims' clothes and bodies.[45] It will be recalled that Detective Smegal explicitly testified at trial that House "directed" the officers to these spots; that House led the officers, not vice versa; and that House took them "directly" to the two places. (*See* p. 1142, *supra).* In his narrative statement to the jury at trial, House did not appear to contradict Detective Smegal's description of what happened,[46] but rather appeared to attempt to explain how it was that he had been able to locate the places where the clothes and bodies had been found.

Detective Smegal's testimony concerning how House led him, Detective McCoy and Sergeant Lee to the place where the clothes and bodies had been found is taken as true by this Court for purposes of ruling on House's habeas petition. In the first place, the testimony is essentially uncontradicted. In the second place, however, to the extent it is contradicted the Court can see no reason why it should not credit Detective Smegal's testimony. On a direct appeal, any conflict in the evidence would be considered in the light most favorable to the prevailing party. *Glasser v. United States,* 315 U.S.

---

**43.** Placing this inquiry on a theoretical plane does seem to be at odds with the "actual" prong of the "actual and substantial disadvantage" test, however.

**44.** The standard for holding a conviction unconstitutional should be at least as rigorous as that for getting a new trial. *See* Ga.Code Ann. § 70–204 *codified in* Official Code of Ga.Ann. § 5–5–23 (1982) (editorial change only).

**45.** The police had previously removed the clothes and bodies.

**46.** In describing going toward the location where House contended he had taken his nap, which also was where the clothes were found, House did state that one of the officers was "sort of leading on." (Tr. 458). However, he also said he knew where the clothes had been found by reference to comments the officers had made during his interrogation. (Tr. 454).

60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). There is no reason why the same methodology should not be employed in a collateral attack on a conviction, where the reliability of the State's evidence on a particular point is not called into question by the habeas petitioner's allegations.

Moreover, House's explanation at trial as to how he was able to locate the place where the bodies were found is implausible.[47] After testifying that he took the officers to the place where the clothes had been found (position No. 6 on State's Exhibit 22—see copy included in Appendix), House testified:

> Well, I knew that they had done told me I was seen running out of the woods up near the dumps so I figured if that was true then the bodies had to be up toward the dump if the clothes were found here.

(Tr. 459).

The testimony at trial established that the bodies had been found at position No. 15 on State's Exhibit 22. That point is roughly 400 yards from the place where the clothes had been found, and is roughly equidistant between the place where the clothes were and House's ostensible exit point from the woods. (position No. 21 on State's Exhibit 22). Further, position No. 15 is fifty feet to the right off the main path running through the wooded area. Taking these facts into account, there does not seem to be any logic in House's reasoning. The Court does note that the confession House had earlier signed indicated he had taken the bodies "up to the Railroad Tracks" (*see* page ——, *supra*). However, even if House were to claim that he had selected a place "near the railroad tracks" so as to be consistent with the confession he had signed earlier, that still provides no explanation at all as to why he assumed position No. 15 was exactly the right spot. For example, why did he select a spot fifty feet off the main path? This absence of explanation, plus Detective Smegal's aforesaid testimo-

ny, leaves with the Court the distinct impression that House was able to locate the spot where the bodies had been found because he in fact had prior knowledge of the particular place. The inference to be drawn from this fact is a damaging item of direct evidence against House.

Moreover, Detective Smegal testified at trial that House orally dictated his confession to a secretary before it was typed up and signed by him. House denied this, at least as to the incriminating parts of the confession. Again, the Court accepts the version of the facts favorable to the prevailing party. *Glasser, supra.* This is further damaging direct evidence against House.

Finally, it is by no means certain that the jury would have accepted Jack House's explanation for the origin of the blood spot, even with evidence of the blood type match. Completely separate from questions of credibility is the matter of the implausibility of the explanation taking into account the location of the spot.

For all of the foregoing reasons, the Court finds the Atkinses' assumed failure to tell Jack House about the blood spot match did not cause House actual and substantial prejudice.

Therefore, House's request that his conviction be declared unconstitutional because of the Atkinses' deficient pretrial investigation is hereby DENIED.

### C. *Trial*

■ A number of arguments have been made regarding alleged failings of counsel during the guilt/innocence portion of the trial. Some relate to the Atkinses alleged failure to call witnesses who could have given exculpatory testimony. These allegations have already been dealt with in the discussion of pretrial investigation.

The only allegation made by House in the section of his brief dealing with the trial which merits discussion is his contention

**47.** House announced at the 1982 habeas proceedings his intention to invoke his Fifth Amendment privilege as to any questions relating to the events of the afternoon of April 14.

(*See* November 16, 1982 habeas Tr. 9–11). No testimony about these events was given by him at the habeas hearings.

that Ben Atkins should not have permitted him to get on the witness stand and give a rambling narrative to the jury. In the course of this narrative, House made a number of transparently manipulative statements, used some profanity, and made the off-hand statement "you can get all the ass you want by the drop of a billfold." (Tr. 459). One does not need to have been at the trial to deduce that these comments impacted negatively on the jury.

Whether Ben Atkins' decision was reasonable depends on what the circumstances were. Had House previously told the Atkinses the facts which he related to the jury concerning his activities on April 14? Or did he only tell them the facts as related by Dorothy Atkins in her habeas testimony— that he had walked all around the neighborhood that afternoon, but could not remember where he had been? If House had not told the Atkinses the specifics which he related to the jury, had he lacked a reasonable opportunity to do so? The proof adduced at the habeas hearings does not adequately address these issues.[48]

The evidence brought forward in the habeas hearings does not persuade the Court that House had told his version of the facts to his lawyers or that he alternatively lacked a reasonable opportunity to do so. Therefore, it becomes a closer judgment as to whether Ben Atkins' decision to let House get on the stand and "tell his story" was a reasonable one. On the one hand, there is substantial risk in letting a defendant speak in narrative form, namely, that he may make statements or admissions damaging to his case. On the other hand, there are tremendous tactical incentives to let a defendant testify where he contends, notwithstanding a signed confession, that he had absolutely nothing to do with the commission of the crime.

Furthermore, House's narrative as a whole was not, at least from the face of the transcript, an unmitigated disaster. He

gave a rather explicit account of his activities on April 14, plus a detailed account of his interrogation and alleged beating on April 15. Considering these factors, the Court is unwilling to hold that Ben Atkins was less than reasonably effective in permitting House to testify in narrative form at the trial.

### D. The Effect of the Atkinses' Failings on House's Death Sentence

■ It is clear from the trial transcript that the Atkinses were unaware of Georgia's separate presentence hearing before the jury in death cases. See former Ga. Code Ann. § 27-2534, 1973 Ga. Laws pp. 159–172, approved March 28, 1973. Once the procedure was explained to them by the trial judge, the Atkinses did not ask for a continuance to consider what to do. Moreover, Ben Atkins proceeded to essentially omit closing argument on behalf of House. The remarks he gave may be described as idiosyncratic at best.

The Court finds the Atkinses failure to acquaint themselves with Georgia's presentence hearing law falls below the standard required of reasonably effective counsel.

There are no clear lines of demarcation which separate a case in which the death penalty is appropriate from a case in which it is not. Also, unlike the guilt/innocence determination, there is no underlying objective truth which gives inspiration in resolving whether a death sentence is unconstitutional in a particular case. It is anybody's guess whether a thorough, impassioned plea for mercy on House's behalf by seasoned, well-prepared counsel would have made a difference in the sentence House received. House has not come forward in these habeas proceedings and shown the Court exactly what mitigating evidence could have been placed before the jury which was not. The jury became aware, during the guilt/innocence phase of the trial, that House had been drinking heavily on the afternoon the

---

**48.** In the 1980 habeas hearings House gave no testimony concerning what he had told the Atkinses about his case, as he was not called to testify at all. When asked in the 1982–83 habeas hearings about this, he was basically unable to remember anything about their discussions except showing the Atkinses his allegedly dramatic bruises.

crimes were committed. They heard testimony from family members that House was not thought to be a homosexual; that he had a wife and children and that he and his family had lived in the same neighborhood for many years. Therefore, if prejudice is a relevant consideration, the Court believes on this record it would have to be found in the quality, or lack thereof, of Ben Atkins' closing argument to the jury.

However, the Atkinses' lack of familiarity with the separate sentencing hearing, and their consequent failure to prepare for it requires application of the standard set forth in *Adams v. Balkcom,* 688 F.2d 734 (11th Cir.1982), holding that where counsel's representation is the functional equivalent in every respect to having no representation at all, then an inquiry into prejudice is not necessary. Applying this standard, there is no question but that House's death sentence must be set aside.[49]

### E. The Atkinses' Failure to File a Motion for a New Trial Based on the Ramsey/Patterson Testimony

█ Ordinarily a habeas court may not consider a claim unless it has first been presented to and rejected by the state courts. 28 U.S.C. § 2254(b). Since this rule is based on considerations of comity, the state may agree to waive the prior presentation of the claim to the state courts. *Morgan v. Wainwright,* 676 F.2d 476 (11th Cir.1982). Also, where a habeas court has before it an unexhausted claim which is not meritorious, it may elect to rule on the claim since denying it would do no violence to principles of comity. *Johnson v. Balkcom,* 695 F.2d 1320 (11th Cir. 1983).

█ For the reasons hereinafter explained, the Court finds that House has failed to exhaust state remedies with respect to his claim that the Atkinses were ineffective in failing to file a motion for a new trial based on the Ramsey/Patterson

testimony. The Court further finds that the state did not explicitly agree to waive exhaustion of remedies with respect to this claim, and the Court declines to find an implicit waiver. However, as the Court finds the claim lacks merit, it elects to deny the claim on the merits.

Title 28 U.S.C. § 2254 provides in pertinent part as follows:

(b) An application for a writ of habeas corpus ... shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, *if he has the right under the law of the State to raise, by any available procedure, the question presented.* (emphasis supplied).

Georgia recognizes the extraordinary motion for new trial. Ga.Code Ann. § 70–208, *codified in* Official Code of Ga.Ann. § 5–5–25 (1982) (editorial change only) provides as follows:

In all applications for a new trial on other grounds, not provided for in this Code, the presiding judge must exercise a sound legal discretion in granting or refusing the same according to the provisions of the common law and practice of the courts.

This catch-all code section appears to be an appropriate vehicle for a claim that a new trial should be granted because counsel incompetently failed to timely move for a new trial on newly discovered evidence. No such motion has been filed, nor has habeas relief been sought in state court (*see* p. 1133, *supra*). Therefore, absent waiver,

---

**49.** The State has made no argument that House's failure to raise a claim of ineffective counsel at the sentencing stage in his original state habeas petition means this Court may not

properly consider this claim per *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The Court elects not to undertake this analysis on its own.

there has been a failure to exhaust state remedies.[50]

Although the State never explicitly agreed to waive exhaustion of remedies as to House's claim that the Atkinses were ineffective in failing to file a motion for a new trial based on the Ramsey/Patterson testimony, it is arguable that it implicitly agreed to waive exhaustion. It never complained about submission of this claim to the federal court until after the Magistrate's Report and Recommendation had issued, recommending that the writ of habeas corpus be granted. Also, as noted, the State has never asserted lack of exhaustion *per se* in these proceedings.

On the other hand, the State did let it be known by filing a motion before Judge Edenfield that it wanted the matter to be heard first by the State court. The State's labeling this as a request for a "remand" is not controlling; arguably the State's objection to the federal court's proceeding at this time was tantamount to raising the issue of lack of exhaustion. There is also a policy argument that the Court should not recognize an implicit waiver here because the trial court is a superior forum for resolving issues concerning the impact of new evidence on a conviction. Georgia courts, like federal courts, apply the *MacKenna* standard for ineffective assistance of counsel, *see, e.g., Jones v. State,* 243 Ga. 820, 830, 256 S.E.2d 907 (1979). If the Ramsey/Patterson testimony is thought to be at all compelling, it requires reference to testimony taken at trial where credibility and the weight be given to individual witnesses' testimony is important. The state judge who presided at the trial remains on the bench, and presumably would be the judge

assigned to hear an extraordinary motion for a new trial. Where the state court is a clearly superior forum for resolving the issues, this Court might be disinclined to find an implicit waiver.

It is not necessary to resolve the issue of implicit waiver, however. Since the Court is convinced House's request for habeas relief based on the Atkinses' failure to file the referenced motion for new trial must be denied in any event, it will proceed to rule on this claim so that a final judgment may be entered.

■ The Court finds that the Atkinses were not less than reasonably effective in failing to file a motion for a new trial based on the information contained in the proposed affidavits of Bobby Patterson and Kathy Ramsey. The new evidence contained in these affidavits is not very compelling, whether the evidence is viewed alone or in combination with the testimony actually presented at the trial. This new information does not establish that the two victims were seen at a point in time after they were ostensibly killed. It does tend to establish that Mrs. Patterson saw two small boys, who could have been the victims, at 5:00 p.m. on the afternoon in question. However Kathy Ramsey's proposed affidavit is not helpful in establishing that the two boys Mrs. Patterson saw were the victims. Further, the reference in Kathy Ramsey's proposed affidavit to seeing Jack House staggering down Claremont in the direction of the wooded area places her last viewing of the victims at a point in time prior to the time House entered the woods.

**50.** It is arguable that the real issue here is not lack of exhaustion, but rather the total inapplicability of the habeas corpus remedy. Habeas corpus is a form of collateral attack on a judgment. A motion for a new trial based on newly discovered evidence arguably is also a form of collateral attack.

Substantially the same method of collateral attack was available to House in state court when the Ramsey-Patterson testimony came to light in 1979–80 as had been available to House in the summer of 1973. In 1973, House could have argued that a new trial should be granted

based on the Ramsey-Patterson testimony; in 1979–80 he could argue that the Atkinses' alleged incompetent failure to file such a motion in 1973 was grounds for reopening the judgment. The two motions seem essentially the same because the issue of the Atkinses' alleged incompetence in failing to file the motion is inextricably bound up in the issue of the significance of the new testimony.

Query whether incompetent failure to collaterally attack a judgment should result in invalidation of the judgment.

Moreover, House's claim that the Atkinses were ineffective in failing to bring the new evidence to the trial court's attention also rests on assumption that the victims must have been killed before 4:00. This is stated to be a function of the fact that T.J. Whitfield, the neighbor who lived on Davis Circle, testified he saw a man wearing a black hat exit the woods at "approximately" 4:00 p.m. Also, House points to the fact that his wife Judy House testified at trial that her husband was at home at 4:00 p.m. However, the Court does not interpret Mr. Whitfield's testimony to the effect that he saw the man in a black hat at "approximately" 4:00 p.m. to mean that it could not have been later. Further, Judy House's own testimony before this Court gives no reassurance that her testimony at trial that her husband was at home at 4:00 p.m. is accurate or trustworthy. Finally, the Court notes Brintley House's trial testimony that Jack House left their mother's home at the corner of DeFoor Avenue and Claremont Street at 2:30 p.m. When this testimony is combined with Jack House's own testimony that he thereafter walked to a liquor store some distance away, drank some liquor and staggered back to the wooded area, it tends to suggest that House entered the woods later than 3:00 p.m.

For the foregoing reasons, the Court finds that the Atkinses were not effective in failing to file the referenced motion for a new trial. House's request that this Court invalidate his conviction based on the Atkinses' failure to file a motion for a new trial based on newly discovered evidence is therefore DENIED.

## III. OTHER CLAIMS ASSERTED BY HOUSE

House's ineffective counsel claims are not the only basis on which he seeks habeas relief. In his Amended Petition for Writ of Habeas Corpus filed March 31, 1980, House set forth a number of additional claims which were not addressed by the Magistrate's Report and Recommendation of January 27, 1982, because they were rendered moot by the Magistrate's recommendation that a writ of habeas corpus issue based on ineffective assistance of counsel.

As all of these additional grounds set forth in the Amended Petition for Writ of Habeas Corpus address only the validity of House's death sentence, but not the underlying conviction, these claims are also rendered moot by the Court's decision herein to invalidate House's death sentence.

There are, however, several claims made by House in his original Petition for Writ of Habeas Corpus, and brief filed in support thereof on August 6, 1979, which seek relief from House's conviction. They are: (1) the claim that House's confession was involuntary and was therefore improperly admitted at trial, (2) the claim that exclusion of jurors irrevocably committed to vote against the death penalty unconstitutionally subjected House to a conviction prone jury, and (3) the claim that House was denied his Sixth and Fourteenth Amendment right to a jury drawn from a representative cross section of the community because persons between the ages of 18 and 21 allegedly were excluded from the pool from which House's trial jury was selected.

Each of these will be considered in order.

### A. *Voluntariness of the Confession*

■ House urges his conviction should be invalidated because the trial judge admitted his confession, which he contends was involuntary, into evidence. As previously noted, the trial court's finding that the confession was voluntary was made after a *Jackson v. Denno* hearing was conducted. For a description of the testimony given at the hearing, *see* pp. 1119–1120, *supra*.

House's brief filed August 6, 1979 addresses this issue. He argues: (1) the trial judge improperly discredited House's testimony and credited that of the police officers and detectives, (2) even if the court properly credited the testimony of the officers, the totality of the circumstances was such that under federal standards, his confession was not voluntary, and (3) the confession was extracted in violation of the

Fifth Amendment privilege against self-incrimination, and the Sixth Amendment right to assistance of counsel because he requested and was denied an opportunity to see an attorney before signing his confession.

28 U.S.C. § 2254(d) provides that a state court's prior resolution of a factual issue is entitled to a presumption of correctness in a federal habeas case, except in certain specified circumstances. Those specified circumstances are set forth in subsections (1)–(8) of section 2254(d). When none of the subsections apply, "the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous". 28 U.S.C. § 2254(d).

In this case, neither House's original habeas petition nor the petition as amended states reliance on any of the referenced subsections of section 2254(d). Although House was granted an evidentiary hearing on this claim, *see* Order of October 17, 1978, none of the briefs filed since the hearing address the applicability of any of the subsections either.

The only possible allusion to one of the subsections is on pages 29–30 of House's August 6, 1979 Brief in which he asserts that the trial court was unaware of certain facts pertaining to Sergeant Fitzgerald, one of the officers present during House's interrogation. Specifically, House refers to the fact that Sergeant Fitzgerald resigned from the police force in bad standing in June 1976 when charges were filed against him indicating that he had concealed information as to the whereabouts of a material witness, Darlene McLane, from the prosecutor during the trial of *State v. Freeman,* which occurred in April 1972,[51] and that he had testified untruthfully concerning knowledge of her whereabouts at trial and later at a state habeas hearing.

The Court finds this revelation does not trigger the applicability of any subsection of Section 2254(d). The only subsection arguably applicable is subsection (3), which deprives the State court's finding of presumptive correctness where "the material facts were not adequately developed at the State court hearing." Although any matter bearing on Sergeant Fitzgerald's credibility would have been pertinent given the sharp factual disputes presented at the *Jackson v. Denno* hearing, the additional evidence relating to Sergeant Fitzgerald's misconduct is not deemed "crucial" or "indispensable" to a "fair, rounded development" of the material facts pertinent to the voluntariness of House's confession. *See Thomas v. Zant,* 697 F.2d 977 (11th Cir.1982). Each party's account of what happened was described in a reasonable amount of detail at the hearing. Further, the Court notes that the trial judge's determination did not hinge solely on Sergeant Fitzgerald's testimony. The primary person conducting House's interrogation was Detective McCoy. His testimony was also directly at odds with House's, as was Detective Smegal's. Therefore, the Court is unable to find that there was a failure to adequately develop material facts so as to deprive the State court's finding that the confession was voluntary of a presumption of correctness.

Having determined that the State court's finding is presumptively correct, the Court's only remaining task is to see whether there is "convincing evidence" that the State court's factual determination was erroneous. No such showing has been made. Indeed, taking into account the testimony adduced at the 1979 habeas hearings, the evidence against House on the voluntariness issue is more, not less, convincing. Sergeant D.V. Lee and Detective C.E. Landrum, neither of whom had testified at the trial, stated that they had had some limited exposure to House during the time he was at the police station. They denied any

---

51. The incident is described in *Freeman v. State of Georgia,* 599 F.2d 65, 68–69 (5th Cir. 1979). *See also* Plaintiff's Exhibit 34, admitted into evidence at June 15, 1979 habeas hearing.

Ms. McLane was an eye witness to the homicide in question. At the time, she apparently had a personal relationship with Sergeant Fitzgerald, who she later married.

**1150**

knowledge of House's having been abused in any ·way.[52]

### B. *The Alleged Guilt Prone Jury*

House's claim that he was unconstitutionally denied a fair trial because prospective members of the jury were excluded who were unequivocally opposed to the death penalty has been ruled upon adversely to House by precedent binding in this Circuit. *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978), *cert. denied, Spenkellink v. Wainwright,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).

### C. *Exclusion of 18 to 21 Year Olds From the Jury Pool*

 House contends the exclusion of 18 to 21 year old persons from the pool from which his jury was drawn violated his Sixth and Fourteenth Amendment rights to a jury drawn from a pool representing a fair cross section of the community.

At the outset, it is not clear whether there indeed were no 18 to 21 year olds in the pool from which House's jury was drawn. The age of majority in Georgia was lowered from 21 to 18 about one year before House's trial, *see* Ga.Code Ann. §§ 74–104, –104.1 (1981) *codified in* Official Code of Ga.Ann. § 39–1–1 (1982), but it is not clear how or if this change affected the composition of jury pools drawn from lists of registered voters. If for some reason persons within the refer-

enced age group were in fact excluded from jury service at the time of House's trial in 1973, the record before the Court fails to reflect such exclusion.

However, the Court will assume for purposes of this Order that no persons within the referenced age group were included in the pool from which House's jury was drawn.

In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court held:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S.Ct. at 668.

Assuming that 18 to 21 year olds were excluded from the jury pool, this does not establish even a prima facie violation of the fair cross section requirement. The reason is simply that persons falling into this age range do not constitute a "distinctive" or cognizable group[53] for purposes of the *Duren* test. *United States v. Allen,* 445 F.2d 849 (5th Cir.1971) (per curiam); *accord United States v. Olson,* 473 F.2d 686 (8th

---

**52.** Detective McCoy also gave testimony at the 1979 habeas hearings. It is noted that his testimony at the habeas hearings concerning the place where part of the interrogation was conducted conflicts with Sergeant Fitzgerald's trial testimony. Sergeant Fitzgerald testified at trial that the entire interrogation took place in the Homicide squad office, which apparently was a room near the front of the Detective Bureau. However, Detective McCoy testified at the habeas hearings that part of the interrogation was conducted by him in an "interview room" at the back of the Detective Bureau. It is possible that some or all of the interview occurred after Sergeant Fitzgerald left. House has made no argument that this conflict affects the State court's determination that the confession was voluntary. Therefore, the Court will not on its own motion undertake this analysis. The relevant transcript references are as follows: Tr.

152, 157, 160, 208, 211, 213, 214, 216, 217, 219, 223, 224, 225, 290, 292, 294, 298, 299, 300, 302–03, 320, 358, 359; June 14, 1979 habeas Tr. 7, 8, 9, 10, 11, 12, 15, 32, 33, 39.

**53.** To establish cognizability, it is necessary for the Petitioner to prove the following: "(1) the presence of some quality or attribute which 'defines and limits' the group; (2) a cohesiveness of 'attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a 'community of interest' which may not be represented by other segments of society." *United States v. Test,* 550 F.2d 577, 591 (10th Cir.1976); *accord United States v. Musto,* 540 F.Supp. 346, 354 (D.N.J.1982); *United States v. Gruberg,* 493 F.Supp. 234, 245 (S.D.N.Y.1979).

Cir.), *cert. denied,* 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); *see also United States v. Guzman,* 468 F.2d 1245 (2d Cir. 1972) (Court stated that "[a]lthough we do not pass on the question of whether 18 to 20 year olds or 24 to 30 year olds or 'youth' in general constitute 'cognizable groups' for the purposes of challenges to jury selection plans, we do note that age is the only factor which defines such categories and despite talk of 'generation gaps,' there are great disparities in opinions, attitudes, experience and life-styles among young people." 468 F.2d at 1247 n. 5), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973); *cf. United States v. Kuhn,* 441 F.2d 179 (5th Cir.1971) (nothing distinctive about 21–23 year olds to set them apart from young adults over 23); *United States v. Quinn,* 364 F.Supp. 432 (N.D.Ga.1973) (people between ages 18–30 "are not a cognizable group requiring special representation"; 364 F.Supp. at 436). *But see United States v. Butera,* 420 F.2d 564 (1st Cir.1970) (Young adults held to constitute a cognizable group, *Butera* is distinguishable from instant case because defendant in *Butera* did not complain about the *total* exclusion of persons under age 21. 420 F.2d at 570 n. 5).

## IV. SUMMARY

House's trial counsel's representation of him in pretrial investigation of his case was deficient in certain respects. However, these deficiencies have not been shown to have caused him actual and substantial prejudice. Therefore, the Court declines to find House's conviction unconstitutional based on counsel's failings in pretrial investigation. The Court finds, however, that trial counsel's lack of awareness of the Georgia procedure for a separate presentence hearing requires that House's death sentence be set aside. All other claims for relief are rejected as nonmeritorious for the reasons set forth above.

Petitioner's prayer for habeas relief from his death sentence is hereby GRANTED. His request for habeas relief from his conviction is hereby DENIED. This case is hereby REMANDED to the Superior Court of Fulton County for such further proceedings as are deemed appropriate consistent with the findings of this Court.

## APPENDICES TO ORDER OF APRIL 13, 1983

Appendix A State's Exhibit 22 (reduced to 3 separate photocopies; shown as A–1, A–2, A–3)

Appendix B State's Exhibit 24, Waiver of Rights form

Appendix C Narrative Statement of Jack Carlton House

1152

APPENDIX A

NUMBERED CIRCLES AND ARROWS INDICATE AREA PHOTOGRAPHED
—— PATH IN WOODED AREA

NUMBERED CIRCLES AND ARROWS INDICATE AREA PHOTOGRAPHED

— PATH IN WOODED AREA

APPENDIX B

INTERROGATION; ADVICE OF RIGHTS

<u>YOUR RIGHTS</u>

Place *Atlanta Police Department*
Date *4-15-73*
Time *12 45 hrs.*

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

<u>WAIVER OF RIGHTS</u>

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed *Jack Carlton House*

Witness: *C. W. Smegal*
Witness: *Sgt R. L. Fitzgerald*
Time: *10:55 pm 4-15-73*

*Education 8th Grade*

---

APPENDIX C

NARRATIVE STATEMENT OF JACK CARLTON HOUSE (Trial Transcript pages 430–463):

Q Now, do you recall on the 14th day of April, starting with—well, just tell us what happened all during the day of April the 14th.

\* \* \*

A ... Well, I got home at twelve o'clock and—I got off at twelve o'clock that night. I went home. Early that morning me and wife—well, I went home and went to bed and early that morning me and my wife had an intercourse and I didn't know if she was spotting or not, she never told me, and anyway my sister came up and we left my three daughters with her. I went with my wife up by Mr. Bass' store and I paid a little store bill I had up there. We left Mr. Bass', Judy and I, and I went up to the bus station and stopped and we caught the bus and rode the bus downtown. We got in Bellwood, we didn't have much money, and we went to the Salvation Army Store. Judy bought what she wanted there and then we went back from the Salvation Army store over to Wells Fargo and she

bought the kids' shoes there. While she was shopping around I wanted a hat like that one out there and she said, "If you want a hat like Smiley has got, go over yonder and get you one." I said, "Well, if you don't care, I will go get me one." She didn't care and I went and got me one.

So, I come back there and she wanted to know if I had enough money to get a hamburger and I told her yes, I had enough to do that, so we went around to this little old place called Country Kitchen or whatever, and it's right around the corner from Wells Fargo. We were sitting there and she was eating a hamburger and I was, too, and we ordered two cokes and a cup of coffee. Well, this colored man came in with his wife and he didn't have but enough money to buy her but a hamburger. She wanted a Coca-Cola and she didn't have the money and so I give him my Coca-Cola and drunk the coffee.

So, we left there and went back across the street over there and caught the bus to go home. Now, I want to make one statement clear before I go any further. I have never wore a watch before I got into this mess. I got this one here while I was in jail, I traded a radio for it. From now on where I go I am going to know what time it is.

Anyway, back to the story. We left there and we went down to DeFoor Avenue on the road which I live and it's about a mile's walk from there to my house so we started walking, toting the packages, and my sister had put a little swing up in the front yard and Sue-Sue, that is next to my oldest daughter, had got hurt on it, scratched her leg on it. Well, I picked her up and she stopped crying, she was upset and it made me upset and nervous because she got hurt, and when I get nervous my back goes to hurting, and I don't know why, it just does, so I took the little swing down and I told Pat, I said, "Pat, I told you to keep them in the back yard, I didn't want them playing in the front yard because there is no fence out here." Well, I throwed the swing up under the house and I went in the house and I laid down across

my stomach on the bed. Then Ronnie and Judy started talking about going down to take the kids down to her mother's. Well, I—I just flat can't stand a drunk, I just can't stand them unless I am drinking, then I get along with them, but if they are drinking and I am not, I just won't—I won't get around them. So, Judy asked me did I want to go with them and I asked Ronnie, I said, "Is your daddy drinking?" He said, "Yes, he is drinking," and so I told them, "No, that's all right," and I was still laying on the bed and I hollered in there, he was in the other room and I hollered in there and asked him. My back got to hurting me worser and I got up and walked and I happened to remember a car over at Mrs. Venable's, and I have done work on the car for the lady at the service station where I worked and she told me I could have the first bid on the car whenever it was to be sold because it belonged to her sister that had recently died, so I went over there to find out if they had made an estimate on the car through the will. She said she didn't know, as soon as she found out, she would let me know.

On the way over there I had bought a cheap half pint of Vodka. I just know it was cheaper than what I usually buy, and I borrowed the money from Ronnie to do that. I left there and went down by Dave's and I had drank that half pint between the time I bought it and—oh, I guess about an hour's time, I'd say thirty minutes' time I killed that one, you know, that's the only thing I have ever killed was a half pint, but anyhow, we left Dave's and I went down there talking to Dave and I left Dave's. I went back to my brother's house, which is my mother's house, he lives with her, and I was going to sell him a tape player that Ronnie had gave me for some money or something or other that he owed me and I told Ronnie, I said, "Ronnie, I don't want Judy to know I am drinking, it will break her heart." And I said, "Go on up there and tell her I am down here selling this tape player to Smiley. Well, Smiley could tell that I had been drinking and I offered to sell it to him and he said, "No." He said, "I can smell it, I can tell by the way you are

walking, I can tell by the way you are talking you have been drinking," and he said, "I ain't going to buy that, all you want to do is go out and get drunk." He didn't know it, but I had enough money on me to get drunk because all I needed was about $2, and I could get drunk sure enough. I needed the money to replace that hat that I had bought to bring me to work, through the week to work. So, he wouldn't—he wouldn't even talk to me about it. So, I was sitting out there on the front porch and Mary Jones' little boy was next door and he was up there playing guitar and it was all out of tune and they asked me if I could tune it, they knew I played a guitar a lot and I could tune a guitar. I told them to come down and I would tune it for them.

Well, little Johnny and a couple of other of his friends were down on the front porch with me and Smiley was in the house and I was sitting out there tuning the guitar. About the time I got the guitar tuned, Johnny's older brother was going to take him to the ball game. Well I wished them good luck and they went on to ball practice.

I was sitting there and I just decided I wanted another drink, so I just go bebopping up Claremont Street toward the liquor store. Could I use this?

Q (By Mr. Atkins) The chart? Yes, it's in evidence, I guess you can use it.

A How should I—

Q You can just put it around here and point it out.

A Okay. Now, these are—this is Claremont Street right here and it runs up in here to Seaboard and right there were apartments. All right. I came up here to Seaboard, I went straight across these apartments over here to Collier Road and the liquor store is right about where they have got it marked right there. All right. I got another half pint of Vodka. It was hundred proof, I don't drink nothing but hundred proof, and I walked around behind the liquor store and I poured it into a coke bottle. I drank the other half of this hundred proof behind the store before I ever moved away from the store and then is when I poured the other half into the drink bottle. I didn't just set there and sip it, either, I funneled it, I am ashamed to admit it but I funneled it. I left there and I came back through here and I come up right behind this lady's yard right straight back through Seaboard, I went down the road about two houses, I cut back in Claremont Street and along about in here somewhere I remember seeing two kids, or maybe it was down about here, but anyway, before I got or right at when I got to here one of the little boys asked me if I was drunk. I grinned at him and said, "Yep," and I just kept on walking. I went to light me a cigarette and I remember stumbling or reaching over to pick it up because I remember something about dropping it. I staggered·on down the hill and I got about right in here and I says, "Well—" I wasn't thinking straight and I had thought that I owed Mr. Camel, who owns the little store up here for a pack of cigarettes because my house is right here and every day I either come down this way or down this way or around this way or through those woods, and my place of work was across the tracks, these tracks right here. I usually walk down beside the building across the tracks, and like I say, my job was just—well, if I had went the road it would have been a three mile walk but this way it wasn't but barely a mile, and whenever I—like I was saying, I came down through here and I—I said to myself, I think I will go up and pay James for that pack of cigarettes. Well, I wasn't thinking that I had paid Mr. Bass that morning, I had forgot it, so I turned up here and as I was going up the hill I looked back and I noticed two little boys at the bottom of the hill on bicycles and I was right about here and I just kept on walking, and about somewhere along up in here I happened to remember, I said me and Judy went and paid the bill this morning, so don't worry about it, and about then I had almost had that—I guess about this much (indicating) left in that bottle. I went across the street, I went down beside here and I finished that little bit and throwed the bottle over my shoulder. I remember raising my hand and tossing it away. I didn't look which direction.

**1158**

I went down this path and somewhere right about in here—no, let's see, right about in here I fell. I don't remember getting up but I do remember sort of rolling over into some leaves. By the time I got on my left—my right shoulder and shut my eyes I could hear somebody talking. I paid them no attention. Well, it wouldn't have done me no good anyway, I couldn't have moved, I just went on to sleep, I passed out.

All right. I don't know how long I was in these woods, I haven't the slightest idea what time it was of the day, I just know when I got up I came back out through here, I came down that little path and there was two bicycles sitting right there. Well, I figured it was those two little boys still playing in the woods because I played in the woods whenever I was ten years old and mama was always getting on me about running off and not staying at home, and I left there—I am going to go back down here because this one in here shows more than that one. I left there and I came up Claremont—I mean De Foor Avenue, and right here where Davis Circle or Davis Place comes into Davis Street I turned up here on account of there is a mean dog that is right here and I didn't feel like fooling with that German Shepard. I turned up here and I went up through here and I went around this corner here and I went up through here and down this street and here is my house.

Now, ladies and gentlemen, what happened in those woods I don't know and—

Q When you say you don't know what happened in those woods—

A Well, I was referring—I know what I did but I don't know what happened to anyone or anything that was in the woods.

Q Go ahead with your statement.

A That is what I meant by I don't know.

Q All right. Go ahead with your statement.

A So I went—like I said, I got home. Then somewhere around ten o'clock my mother-in-law and them came up and was talking to me about buying a car and I had been drinking and I was getting dry and—well, liquor was pretty good. So, I didn't really care about the car because I have no driver's license, matter of fact that is why I had no driver's license. I went down to see about the car, I drove the car. Me and my daddy-in-law that night before, though, had got pretty wiped, well, I will put it more plainly, drunk, and I had a little scar right up here on my shoulder. Now, on the way down there I was riding in a two-door car on the left-hand side of the car in the back seat and when I got out of the car, when we got down there I scrathed my shoulder on the top of the—roof of the car. I didn't even remember whether I looked up there to see if it was—it was raining on the way down there and I didn't look up there to see whether I was scratched or what, so anyhow, I got in there that night and my daddy-in-law, he slapped me about the same place, he got a little tight and I just—and it hurt my feelings, I ain't lying, I just walked outside and set in the chair.

Then, I went back in the house and I was wearing that hat, a tee shirt and that pair of pants and a pair of brown shoes and me and my wife went in the back back there and I went—passed out. The next morning I got up and I went outside, we put some gas in the old car, Walter did, and I drove it down the road and I got to thinking about what Judge Daniel Duke told me, if I ever got caught driving and drinking again, and I just decided the car wasn't worth it, I wasn't going to go back to jail for nobody, not even for a car, huh-uh, no, I know I am more needed at home than in jail anyway, so I—like I say, I come back up the driveway with the car and asked my wife, I said, "Judy, go in there and fix me a cup of coffee. Well, we went—she went in there and fixed me a cup of coffee and I went in there and set down in the chair and started drinking it.

Then, these nice officers came up and I was sitting there and I—I could see them from where I was sitting and I wondered—I could tell they were polices or detectives right off just by looking at their

cars, so I went outside drinking my coffee and they asked was my name Jack House and I said, "Yes, sir, it is," so we left there—well, let's stop right there and say what happened there. They started pawing at my clothes, what I mean by pawing, I don't mean that they was jerking at them, I mean they was just talking and pulling on them, and inspecting them like I was made out of gold or something. And then the policeman, he asked me, he said, "What happened in those woods yesterday?" I said, "I don't know what you are talking about, Mister." I said, "I just don't know what you are talking about." I was scared to say anything on account of the way they was pawing at my clothes, and any common idiot could see they was trying to blame something on me, so they said, "Would you go downtown and talk it over with us?" I said, "Well, would you mind telling me what we are going to talk over?" They wouldn't tell me. So, I said, "Well, you won't tell me up here," so I said, "Why should I go down and talk something over with you that I don't know what we are going to talk about? He said, "Do we have to get a warrant?" I said, "That ain't necessary, I will go, but I would love to know what we are going to talk about." He said—you know, I hadn't the slightest idea. So, on the way down to the police station they was asking me questions and I still didn't know what they was talking about and they said, "Come on, you might as well tell us, you was in those woods." I said, "I don't deny being in the woods yesterday." I said, "Which woods are you preferring (sic) to?" He said, "The ones across the street from that little store up there." I said, "Yeah, I was in the woods, what happened, did somebody burn them down?" And then that sergeant, I didn't know the sergeant's name at that time, nobody ever told me his name, they just called him Sergeant. I didn't know his name until I got in the courtroom. He said, "You are going to wish they had burned down by the time I get through with you or we get through with you," I don't remember exactly which statement he made, but he made that statement, so we went on down to the police station.

Well, we got in there, walked inside, and I never knew my brother was behind me, and I never saw my brother when I got out of the car, I don't even remember seeing my brother then, so we went on up to the third floor. We went in there and the polices started asking me a bunch of questions and I still had no answers. He put this waiver of whatever they call that in front of me and he read off my constitutional rights. He asked me if I understood them. I said, "Yes, I understand my rights." He said, "Well, then take this pen and sign right here saying you understand it." I took the ink pen and I signed the paper.

Well, from there things began to get a little nasty. He said, "Come here a minute." I said, "Man, let me get a drink of water," and he wouldn't let me get a drink of water. I begged for thirty minutes for a drink of water. They wouldn't let me get a drink of water. I asked for a cigarette, they wouldn't let me have no cigarettes. Well, he kept on and he kept on and he kept on and he kept on and then he got real mad and nasty. Do I have to say the words he said?

THE COURT: Mr. Atkins, you want to advise your client?

Q (By Mr. Atkins) I think we have said about every word that is sayable in the trial of this case. You might as well go ahead and say them, yes, sir.

A I said, "Sir, I still don't know what you are so mad at me for," and I said, "I would appreciate it if you would tell me." He said, "You fucking bastard, I want to know—" He said, "You know what happened down there," and after he slapped the desk like that (demonstrating), he stood up and then he said, "You mean to tell me you don't know what happened down there?"

Q I would like for you to say which one of these officers you are referring to.

A Sergeant—I can't remember his name, Fitzgerald. And Sergeant Fitzgerald stood up. So, he said, "Well, I will tell

you what happened down there, there was two little boys killed and raped in those woods." I set back and I said, "Oh, Lord, here we go." And then he called me down at the back of the little room.

Now, this room has three desks in it but I vaguely remember three, it seemed more like two desks and a bunch of filing cabinets to me, I was so shook up after I knew what they was trying to blame on me, it was pretty rough, so he took me back at the back of that place where there is a bunch of lockers and he made me stand, and down there where I work we pack boxes of cards and the box sets up on an little old stand like this here and sets slanted like this here and the top folds over. Well we take cards out of a machine, hold them and stick them down in here and then whenever you run your hand up the side of the boxes and pull the tops down, the box will cut you right along here, so he made me stand there and he took pictures of me, of my hands, then he reached up and saw that little old nick place I had up there and he said, "What's that?" I said, "I don't know, I guess it's where I hit myself on the car last night or my daddy-in-law slapped me." He looked up there and said, "Your lip ain't busted," but he said this down at my mother-in-law's and we have done passed that, but anyhow, we got that much over with and we was standing back there and this photographer was taking pictures of me. A few minutes later the pictures stopped taking and he looks at me and says, "You know who is the meanest man in here?" I looked at him and I said, "Who?" He said, "There sets Colombo over there," and I said, "Hello Colombo," and he said, "Ask him who is the meanest." I said, "Who, him?" He said, "No, I am the meanest," and he wasn't lying, either. So we left—that statement was all that was said, and then he said, "Give me those clothes."

Well, I didn't mind giving him my shirt nor my shoes nor my socks, but I don't pull my pants off in front of my wife and I didn't like pulling them off in front of him either, so he—he said, "Give me those pants." I hesitated and I said, "What you want my pants for?" He said, "I want to get them pants for the blood on the side of them." I said, "Mister, that's not blood, that's dye off the cards that I handle down there were I work," and I get that red dye and all color dye on me and I wipe it off. Well, that is what I thought it was. I didn't know my wife was on a period, I didn't know that this was even blood, I thought it was dye, so I—all right, if you want them, so I gave them to him. Well, he made me stand buck naked for approximately about ten minutes. He said, "Turn around and stare at that combination and don't take your eyes off of it." Sergeant Fitzgerald said this, now. I said, "Okay, Doc."

Well, that didn't help. So, I stared at that combination lock. Well, right after that they give me a pair of pants and took me over to Grady Hospital, took some blood samples of me, and a couple of other tests I think, I don't remember what it was, I was shook-up, so we went back and I was barefooted and I had on a—just a pair of pants and no shirt and when we went back we went back to this office there and I asked Mr. Fitzgerald there, I said, "Sir, could I please have a drink of water?" He said, "Uh-huh," and he said, "When you start talking we'll give you a drink of water." I said, "Sir, if I knew what to tell you I could talk to you but I don't know what to tell you." He said, "Well, we are going to find out." I said, "Well, I hope something happens," so I asked for a cigarette, they took my cigarettes away from me. Then, we left—he went back in the back of the—I was sitting at the front desk and he went back to the back where the lockers were with three other guys, I didn't know their names, but one of them was that guy that made me think he was a psychologist—what was his name?

Q Sergeant McCoy?

A McCoy, yes, sir. One of them was Sergeant McCoy, one of them was that—what was that slim fellow's name that said he went out to the place with us? I am just dumb about names, I can't remember them. Anyway, Sergeant Fitzgerald and McCoy

and this young man that hadn't even been in this court yet from which was one of the men that hit me, I haven't seen him the whole time I have been here, he went back there, these three were back there talking and all of them shook their head yes, so they walked by me and said, "Come on." Well, I fell in the middle of them. We went down, out the door, down the little old steps, up to the lineup room, and down there at that lineup room there is a space that consists of two or three small rooms not much bigger than a jail cell that I am in over there at the Fulton County Jail. Maybe one room is twice as big or maybe one a half times as big, but anyway, we went in there and on the back of one of those chairs it had, "Interrogation Department."

Sergeant McCoy was setting there in a chair and Sergeant Fitzgerald was standing up and he set me in a chair. Well, Sergeant Fitzgerald got to talking to me and it was 12:10 whenever I signed that first paper, that just merely said I understood my rights, nothing was said about denial of a lawyer, nothing, and them kind of words whatsoever about not wanting a lawyer was said to me, they asked me did I want a lawyer in the case, and I said, "Well, I don't know if I need one now or not," and I said, "I will find out."

So, we went into that little room like I was talking about and we get down there and he says, "Come on, Jack, tell me what happened in the woods." I went through the details about how I come up Claremont Street and Mantissa and across the street and I went in the woods and I told him I was so drunk I couldn't stand up when I got in the woods, that when I did get in the woods I fell down, I rolled over a couple of times, I shut my eyes and I passed out. When I said, "I passed out," he slapped me out of the chair into the floor. He said, "You can do better than that, can't you?" I said, "Man, I can't tell you something I don't know." Then he said, "Come here, stand up." I walked over to the wall where he appointed (sic) me to stand. He said, "You little queer-faced son of a bitch, you know what happened over there, come on

and tell me." I just didn't know what to tell him. Then he drew back his fist and he hit me in the stomach. I—all I could do was stand up. He said, "Now, what did you do?" I said, "Mr. Fitzgerald, I don't know what you are talking about." Then he kicked me in the straddle and I hit the floor that time and I was hollering and I stood up and he said, "You holler like that one more time and I am going to bust every tooth in your head out."

Well, I know how it feels to have a too-thache and I didn't want one of them. So, he said, "Now, come on, tell me what happened in the woods." I said, "Mr. Fitzgerald, I told you what happened in them woods, I passed out." When I said that he slapped me across here (indicating) and my head hit the wall that I was standing in front of and I hollered again and then he told me about, "I am only going to tell you one more time not to holler again." He said, "You are like the old bear that went in the woods to take a shit." I said, "Sir, what do you mean by that?" He said, "Yeah, you went in, took a shit, but you had to have a little bit of honey to go with it, didn't you?" I thought he was a fool. I know I didn't use no bathroom in those woods. And he said, "Well, that's where we found the clothes, you used the boy's pants to wipe your ass with them you got through using the bathroom." I said, "No, sir, Mr. Gerald (sic), not me, Fitzgerald." He said, "Then who did?" I said, "Well, why don't you go get the one that did and ask him and maybe he can tell you." Well, when I said that he slapped me down. Then he said, "I will be back in a minute," and Mr. McCoy, the whole time I was getting this beating, was sitting there in that chair and I was begging him to do something to get this man to stop hitting me. "Well, Jack, if you don't talk I can't—if you can't cooperate I just can't do nothing for you, son." He said, "I know you are not a violent man, I can tell by the way you are doing." I said, "Well, then for God's sake, do something." Yeah, he did all right. He sat there and questioned me and he is not lying, he never laid a hand on me, but he was lying when-

ever he said he was—he never saw no brutality because I don't know what else you can call it. He set there the whole time this was going on.

All right. The Sergeant, Fitzgerald, went to get a cup of coffee. He said, "You better tell that man something by the time I come back." Well, it was up to this right here. I had known there were two boys killed in the woods from what the Sergeant told me. I lived in that neighborhood all my life, I know those woods just as good as that right there, as the back of my hand. All right. Too, he said that I took a crap near the tree house, and he said that I used the bathroom and wiped with the boy's pants. Now, this I knew. All right. I set down. Mr. McCoy said, "Come on, now, tell us the rest of it, facts is all we want, facts." I looked at him and I said, "Sir, let me ask you something, have you ever had a question asked you that you didn't have an answer for, even if it meant your life," and he said, "No, I ain't never had nothing like that." He said, "Answer the questions." I said, "I can't tell you nothing I don't know, sir."

Well, we talked—we talked and carried this same conversation over and over and over for about 15 minutes. Then Sergeant Fitzgerald come back in. I said, "Oh, Lord," and he had this young friend of his with him that was talking, you know, I told you the three were ganged up together in the other little interrogation office up there where the desk was. He said—we was still in this room with the two chairs when him and this other fellow came back in. He said, "Did he tell you anything?" Mr. Fitzgerald asked if I told him anything and Mr. McCoy said, "No, he hadn't said a word, nothing only except he don't know what I am talking about," and I told Mr. Fitzgerald, I said, "Sir, I can't tell you something I just don't know." Well, he slapped me out of the chair again and I got up and he said, "Come on and tell me how you done it." I said, "Done what?" He said, "Tell us how you raped the boys." I said, "What?" He said, "Tell us how you raped the boys." "Mister, I didn't do it." Well, he slapped me. He says, "Well, it's like I said, if you didn't do it, somebody did." I said, "Yeah, and it's like I told you, get the man that done it and maybe he can answer your questions." Well, he kicked me in the straddle for saying that. He said, "Don't get smart with me, boy." I stood up and then he raised—he—I had my hands like this here trying to block his hits and he said, "Are you trying to hit me?" I said, "No, sir." He said, "Put them hands down beside you." I dropped my hands down beside me. I didn't want no trouble with the man, I still ain't mad with the man, but he done his job wrong, and wrong is wrong, so I put my hands down beside me and he took his hand like this right here and hit me again in the stomach, right here (indicating).

Well, I grabbed my chest and then he took his hand and flipped mine out of the way, he took his fist like this and said, "Do you know what is right there?" I said, "Yeah." He said, "What?" I said, "My ribs." He said, "Yeah," and he said, "Would you want some of them broke?" I said, "No, sir." He said, "Come on, then, tell us, tell us, just give us some facts." I said, "Mister, I can't give you something I don't know.

Well, how many times they hit me in there I don't really know but I am just telling you some of the things that I remember what he said when he did hit me. Other times he hit me for no reason. I just didn't have nothing to say. Well, he said, "I am going to go up here and take another break. I will be back in a minute," and then he left, him and this blond-headed fellow with him, and this Mr. McCoy set there and he said, "You know, psychology sometimes helps in cases like these." I said, "Yes, sir, it sure would." I said, "But you hadn't been seemed to be using any lately." I said, "You mean to tell me about psychology and you set there and let them beat me like this?" He said, "Well, I can't do nothing until you do." I said, "Sir, that is just a crying shame, I don't know nothing."

Well, he—the Sergeant, Fitzgerald and his friend came back a few minutes later.

Mr. Fitzgerald said, "Well, did he say anything?" Well, by this time I had known that the boys had been sexually attacked and I had known that they was dead and I had known—well, that somebody had killed them and that their clothes were laying up there by that pile of mess. Well, then, the policeman, Mr. Fitzgerald, the Sergeant, rather, said, "Did you use the path?" I said, "Yes, sir, I sure did." I was preferring (sic) to when I left. I came out the same way I went in. He made me stand up again. Well, now, he had this gun that I prefer (sic) it was a 38 automatic which the bore on it was what I was looking at because it looked about the same size of a 38 automatic. He pulled that gun out of his holster and he had a brown holster on that day. He had a blue shirt on that day and he pulled that holster out of his—I mean that gun out of his holster, I got tongue-tied, but anyhow he put the gun up to me, he said, "Come on and taken this gun, take this gun." His face was turning red and he said, "Take this gun, take this gun." Well, I said, "Mr. Fitzgerald, I don't want that gun." I said, "I just don't want that gun." He said, "Wouldn't you love to kill me?" I said, "No, man, I ain't got no hate for nobody." He said, "What do you think about me?" He sure had a lot of nerve there. I said, "Man, you're all right, you're all right." He said, "No, I ain't, you think I am a son of a bitch, don't you?" I was scared to say so because I knowed if I said yes I would get slapped for it. The thing about it was he would take his open hand and he would hit me across the face or anywhere in the face with my head against the wall and let the hair cover the knots that I got and my pants would cover the straddle knots that I got.

All right. He took that gun and put it up to my chest and was doing like that (demonstrating). He said, "Come on and take this gun, boy." I said, "Mr. Fitzgerald, I don't want that gun." Then he took the gun and he put it at the side of my head." I said, "I have got heart trouble, man," and he said, "Well, we might just cause you to have a heart attack, you son of a bitch, and then we won't have to fuck with you."

That man is crazy. He had done started shaking and he had done got me upset and I—I said, "No, I—I did use the path. He said, "No, you didn't." Well, when he said that—he said, "I have just about had a damn nuff of you," and he put his gun back in his holster and he walks over there and he started slapping me. He pulled me to the other side of the room away from the chairs and he started slapping me and then this friend of his, the brownish-blond, reddish-blond-haired fellow came up and he was a big man, too. I seen him when he drawed his hand back, it was just as wide a swing as you could get and he slapped me and Sergeant Fitzgerald kicked me to the ground or the floor and my heart started hurting after that and I seen black spots coming into my eyes and I had done developed a hell of a backache and an earache, I've had an earache all my life, it hurts mighty near all the time, and I just couldn't take the pain. I stood up and I said, "Hold it, hold it, hold it." I said, "It's obvious I didn't use the path." I said, "Okay, whatever you people want I will willingly sign, but just keep your hands to yourself," and Sergeant Fitzgerald is a man of his word there. He said, "You sign that paper and I won't lay another hand on you." Do you know something, that is the only truth that man has told. After I signed that paper he didn't touch me one time after.

Well, when we went out to the place where the boys were, we got out there and they asked me where did I throw the drink bottle. Well, right along in here somewhere. Well, one of them was looking for the drink bottle and Mr. McCoy, the whole time we was out there, the whole time we was in the car around in that area they made out like Mr. Smith, I never knew the man's name before I come to court now, Mr. Smith and the other father was going to kill me. Well, I was already shook-up bad enough as it was and this sure didn't put no pretty side to the story, either. Well, I started to taking them through the woods there and they all crowded around me and we went down in this clearing, I knew where the tree house was. They mentioned

something about a big piece of plastic, but at that time I did not remember the plastic because I was shook-up, but I remember earlier that plastic has been there for I know three—two or three months before that, and anyway, we went up to where this clearing was and that piece of plastic and this one dude, he walks sort of—you know, sort of leading on, and he walks down and stands beside this pile of mess. Well, I am looking all around, my hands were cuffed like this here (demonstrating) and I am just looking and he says, "Where did you lay down at?" I said—I was trying to remember where I laid down at and I seen a cigarette butt. I said, "Right there." All right. He said, "Well, where did you rape the boys at?" I said, "I didn't rape no boys."

Well, right now I want to go back to something I didn't—that I left out back at the interrogation office. Before we left there Sergeant Fitzgerald was setting beside me, Sergeant McCoy was sitting over there, and this man was typing out the sworn statement, so-called statement that they got. Mr. McCoy told me to go ahead and talk the confession. Well, I started talking confession. When I got to the part where I went into the woods and passed out I stopped. I never said a word on that confession after that and I hope God strikes me dead if I did. I am swearing now. When I got out there I wasn't. I signed the statement, he handed it to me. He said, "Read it." I didn't care to read it. It was all a big fat lie from the start, after I passed out, and I just had no desire to read it, I just set there and stared at it. I could see my future, I could see my wife, my three kids and all that down the drain. I mean, you can get all the ass you want by the drop of a billfold.

Anyhow, now we are going back to the woods. We got out there and they said, "You better hurry, now, and tell us where you raped the boys and how you done it." I said, "I didn't rape those boys," I told them that in the woods, and I told Mr. Fitzgerald—not Fitzgerald, he didn't go out there, I told Mr.—I have said his name three dozen times and done forgot it.

Q Are you talking about Mr. McCoy?

A Mr. McCoy, yes, sir. Mr. McCoy and that other gentleman that, you know, they said earlier that went out there that wasn't even here yet, that hadn't been up here yet, and that other guy that went out there that was here, I told them plain I didn't do it and we stood there for a few minutes and argued about that. He said, "Well, where did you take the bodies?" Well, I knew that they had done told me I was seen running out of the woods up near the dump so I figured if that was true then the bodies had to be up toward the dump if the clothes were found here. I went walking up there slow looking around, and like I said before, I've gone through them woods every day for a month and a half because I had no car and I worked across the railroad tracks. I didn't go that particular way every day, no, I went that particular way every now and then, but you can usually tell whenever somebody has tramped through a bunch of ivy, so I just went slowly walking, taking my time and looking and trying to figure out something to say or do to keep from getting stomped any more. Well, I had have rather died than have signed that statement.

Anyhow, we got out there and I was still looking, slowly walking and looking and they kept trying to rush me. Well, I wasn't going to rush, if I had got shot I wouldn't have rushed. I just kept looking, hoping that Mr. Fitzgerald would be gone home by the time I got back to the jail because he told me if I come back it was going to be hell, that he was hungry and wanted to go home to supper, and I thought the man must have had an iron gut, I don't see how he could eat supper after all that, so anyhow we went out in this ivy, led off to the right, and there is a little old patch of ivy out there, and I've noticed several times before, I am paranoid about snakes, I don't care what kind of snake it is, I am just paranoid of them. I've got a bad habit of looking down at the ground where I walk and when I am in the woods especially I watch every step I take because anybody in

my family will tell you I am paranoid of snakes bad. So I noticed that patch of ivy. I didn't want to go through that patch of ivy because I was scared there might be a snake in that patch of ivy. I went through it but I went through it mighty slowly. I went up a little hill sort of, the three officers were with me. We got on top of that hill and Mr. McCoy says, "Is this the place?" I looked around and I could tell that the ivy had been packed down a pretty good bit. I just stood there and Mr. McCoy said, "Is this the place?" I walked down, I turned around and I walked back up. I mean, simple, logical facts will tell you that it was the place just by looking at the ivy. I didn't know it was the place but I was going by the imprints of the ivy being ruffled up, packed down, and I merely said, "Yes, sir," and I still don't know if that was the place.

He said, "Well, why did you do it for?" I busted out in tears and said, "I didn't do it." He said, "You mean to tell us you showed us where this place was and didn't do it? I said, "Mister, the last thing I done was go to sleep back up the path yonder."

Well, he said, "Well, come on, tell us why you done it." I said out loud, "I don't know." I said to myself why are you trying to blame this on me, and after I said, "I don't know," we all started walking back to the car.

Well, we come back to the police station and God only knows how glad I was to see Mr. Fitzgerald gone and I laid in that jail cell, I begged for a phone call, I begged for a lawyer present before I signed that statement. "Oh, we'll get you one," Mr. McCoy said, "We'll get you one, just go ahead and sign it, we'll get you one." Well, I never did get a lawyer. I didn't get a phone call until three days later. I didn't see a lawyer, none of my family, I didn't talk to them, and my whole entire rights was violated, in the City of Atlanta you ain't got no rights when you get locked up, you just ain't got any, so whenever I heard those keys rattling while I was sitting in that cell I was praying to God, I just knew they was coming back to beat me up again, so that Wednesday—that Tuesday we went to the Judge. The Judge says, "Is this man being represented by a lawyer?" He says, "No." I told the Judge, I said, "Your Honor, I hadn't even had a phone call, let alone a lawyer." He told Mr. Fitzgerald, he said, "Mr. Fitzgerald, be sure this man gets a phone call before you do anything else." Mr. Fitzgerald carried me back, he gave me a dirty look, I started to say something to the Judge then about the brutality I went through but I was scared to on account of Mr. Fitzgerald, as you very well know, he is a good-sized man, and I believe he is the only man I have ever been scared of, so we went back to the jail cell, what I mean by scared of, he is the only man I ever seen that I am afraid to even look at, he just—I don't know, people just are that way to me. I am just paranoid of them, I guess, but that—I never went back to—before the Judge until July the 9th, that was the last time I went before the Judge. That is all I have got to say.